OWEN MEHAN & another *vs.* LOWELL ELECTRIC LIGHT CORPORATION.

Middlesex.   March 16, 1906. — May 17, 1906.

Present: KNOWLTON, C. J., MORTON, LORING, BRALEY, & SHELDON, JJ.

*Negligence*, Employer's liability, *Res ipsa loquitur*.   *Electric Light Company*.

In an action under R. L. c. 106, § 73, by the next of kin of an employee of an electric light corporation against the corporation for causing his instant death, there was evidence that the deceased was an oiler whose ordinary duties were to oil and clean the engines in the engine room of the power house of the defendant under the direction of the engineer, that on a shelf about two feet from the level of the engine room floor were instruments called regulators, the purpose of which was to increase or diminish the amount of the current sent out over the lines, and which were connected with a switchboard which was on a

platform above the regulators eight or ten feet high reached by steps from the engine room floor, that the passage from the engine room floor to the regulator shelf was closed by two parallel iron bars one end of each of which was supported in a socket in the brick wall of the building and the other end in a socket screwed to a wooden post near one of the iron posts that supported the framework of the switchboard platform, this iron post being about three inches from the engine room floor and separated from it by the bars, that a passage to the regulator shelf could be opened by unscrewing the bars from the sockets at one end and pushing them through the sockets attached to the wooden post which supported them at the other end, that the regulators and the switchboard were in charge of the defendant's electrician, that while the electrician, the engineer and the deceased were on the engine room floor, there came a loud report and a flash, that one of the regulators was smoking, that a little flame coming out of one corner of it was on the chain cable leading to its side, and that the tape insulation was burning, that the deceased immediately rushed to the bar that had to be unscrewed and pushed through the socket before the electrician could get into the electrical enclosure to put out the fire, that the engineer after seeing to the engine followed, and all three men then took part in unscrewing and pushing aside the upper bar and thus enabled the electrician to step over the lower bar into the space where the regulators were, that he stepped through with a pail of sand in one hand and a scoop in the other and was scooping up the sand, when the deceased in some way came in contact with the iron post and was instantly killed by an electric current passing through his body. The engineer testified that in case of fire it was the duty of the deceased to assist in putting it out if possible, and the electrician testified that there was a fire four or five weeks earlier which he assisted in putting out, and that the engineer and the deceased were there assisting. *Held,* that the jury were warranted in finding that the emergency justified and required the deceased to be where he was, and in finding that he was in the exercise of due care.

It is evidence of negligence on the part of an electric light corporation, that, after having knowledge from the fact that electric shocks were received by masons at work in the basement of its building that its system in use for carrying off superfluous electricity was not working properly and that electricity had found its way into the iron framework in the building, it continued on the next day to use the same system without change and without giving notice to its employees of the danger of receiving a charge of electricity on coming in contact with the iron work.

*Semble,* that the fact, that a workman employed to oil machinery in the power house of an electric light company on coming in contact with an iron post in the building was killed by a charge of electricity, is not in itself evidence of negligence on the part of his employer.

To entitle the next of kin of an unmarried employee to recover against his employer under R. L. c. 106, § 73, for causing his instant death, on the ground that the plaintiffs at the time of his death were dependent upon his wages for support, it is enough to show partial dependence.

In an action under R. L. c. 106, § 73, by the father and mother of an unmarried son against his employer for alleged negligence causing his instant death, brought as the next of kin of the deceased, "who, at the time of his death, were dependent upon his wages for support," it appeared that the family before the death of the deceased consisted of the plaintiffs with their two daughters, the deceased and another son, that the father was seventy and the wife sixty years of age, that the father earned certain money from time to time but had no regular

work for all the year, that the mother was not very well and sometimes could not perform household duties, that the younger daughter had not worked for two years but stayed at home and helped her mother in conducting the household, that the other daughter worked for regular wages, that the other son now surviving, who was a student in a medical school, lived at home but otherwise supported himself, contributing nothing to the support of the family and receiving nothing except his lodging and meals, that the son who was killed received $12 a week which he handed to his mother, that the father kept as pocket money $2 a week, and that his remaining wages, those of the working daughter and those of the deceased son, in all about $24 a week, were given to the mother for the support of the family of six, and the personal expenses of all but the son in the medical school, that after the death of the deceased the family continued to live in the same house and to pay the same rent, and the mother testified that they had "plenty to eat and drink and wear." It appeared that since the death of the son the working daughter had had a slight increase of pay. *Held*, that the evidence warranted a finding that the plaintiffs were dependent, at least in part, on the son who was killed, and were entitled to maintain the action as his next of kin dependent upon his wages for support within the meaning of the statute.

Tort under R. L. c. 106, § 73, by Owen Mehan and Jane E. Mehan as dependent next of kin to recover damages for the death of their son Frederick C. Mehan. Writ dated December 8, 1904.

At the trial in the Superior Court before *Bell*, J. the following facts among others appeared:

Due notice of the time, place and cause of the accident was given to the defendant. The defendant was engaged in the business of furnishing electricity for light, heat and power, having a central station or power house on Perry Street, in Lowell. The deceased was an oiler who had been in the employ of the defendant about a year and a half, and his ordinary duties were to oil and clean the engines in the engine room of the power house under the direction of the engineer or assistant engineer. There were three oilers who alternated in the performance of these duties except when all the engines were running when they all were on duty. There were seven engines on the second floor of the power house, all operated by steam. On the easterly side of the engine floor, placed upon a shelf about two feet from the level of the floor, were eleven regulators, so called, placed in a row about one foot apart. Above these regulators was a platform some eight or ten feet high reached by steps from the engine floor, and upon this platform were situated the switchboard connected with what is known as the alternating circuit

and the other instruments connected therewith. The purpose of the regulators was to increase or diminish the amount of the current sent out over the lines, and they were connected by wires with the switchboard and with the dynamos by which the power was produced. The regulators were box-like in shape, being about two feet high ordinarily and about fourteen inches across the face, the casing being of iron or steel. The switchboard platform or gallery above described was supported on an iron frame resting upon iron posts at each corner, which stood upon separate brick pillars which were embedded in cement foundations in the cellar beneath. The defendant's evidence tended to show that connected with this iron frame was an artificial "ground," as it is called, which consisted of a copper wire attached to the iron frame and leading down into the ground in the cellar, where at a depth of about six feet it was connected with a copper plate embedded in charcoal. The object of this ground was to lead off into the earth any current of electricity which accidentally might get on the iron frame or the posts connected with it. At the southerly end of the row of regulators above described and about three feet distant from that end was No. 7 engine, near which the accident occurred. Across the southern end of the regulator shelf and of that part of the room where the regulators were situated ran two parallel iron bars, one about eighteen inches high and another about three feet high and about eight feet long. One end of each of these bars was supported in a socket in the brick wall of the building and the other end in a socket screwed to a wooden post near one of the iron posts above described. These bars closed the passage between the platform or shelf where the regulators were situated and the engine floor, but a passage could be opened by disconnecting the bars from the socket at one end and pushing them through the sockets attached to the wooden post which supported them at the other end. The post, the touching of which caused the accident, was in the enclosure where the regulators were and was separated by about three inches from the engine floor by the bars above described. The jury took a view of the premises, and at the trial a floor plan of the engine room and six photographs were used. The accident occurred on December 11, 1903, at 6.45 A. M. It was admitted at the trial that the de-

ceased was instantly killed and died without conscious suffering. His death was caused by coming in contact with the iron post mentioned above, and receiving from it a shock of electricity.

On the engine room floor around No. 7 engine was a leaden mat. This mat was electrically connected with the framework of the engine, which in turn was electrically connected by steam pipes with the boilers in the power station and these boilers were in turn electrically connected with the water mains of the city of Lowell. This grounding of the leaden mat and the engine to the city water mains was necessarily occasioned by their construction and constituted one of the best known artificial grounds.

At the time of the accident the only persons in the part of the building where it occurred were one Armstrong, the assistant engineer, one Livesey, the electrician, and the deceased. Livesey was looking after the switchboards. Armstrong had general charge of the engines, Markham, the chief engineer, being away, and Mehan was watching two of the engines, having finished cleaning up No. 7 engine a short time before.

Armstrong testified that just before the accident there was a loud report like thunder and a flash like a flash of lightning at the end of the station where the regulators were, and a reflection on the platework of the switchboard. Mehan started in the direction of No. 7 engine and Armstrong followed him, both running. When they reached No. 7 engine, No. 10 regulator was smoking and a chain cable leading from the regulator to the switchboards above was burning, while a blaze was coming out of one corner of the regulator. Livesey had come down the flight of stairs leading from the switchboard gallery to the engine room floor, and was unscrewing the upper iron bar, separating the regulators from the engine room floor, when Armstrong arrived. Mehan, who had preceded him by sixteen feet, was doing the same; and all three assisted in taking out the upper bar, which enabled Livesey to step over the lower one into the space where the regulators were. As they shifted the bar aside Livesey stepped through with a pail of sand in one hand and a scoop in the other and was scooping up the sand, when Armstrong felt a brushing sensation on one side and turning saw Mehan grasping the iron post with his face drawn close to it

while his feet stood on the leaden mat around No. 7 engine. He never recovered consciousness. Livesey meanwhile had put out the fire with the sand and dropped the pail to attend to Mehan.

The evidence on the question of the dependence of the plaintiffs upon the wages of their deceased son for support is described in the opinion, as also is the evidence on the question of the defendant's negligence.

At the close of the evidence the defendant among other requests asked the judge to make the following rulings:

" 1. On all the evidence in the case the plaintiffs are not entitled to recover.

" 2. There was a presumption that the defendant had furnished proper machinery.

" 3. There was a presumption that the superintendent of the defendant was a competent person for the business for which he was employed by the defendant."

" 7. If it had not been the custom to call upon the oilers to assist when there was trouble in the electrical machinery then the deceased would not be justified in going to the place where he was injured in the expectation that he might be called upon to assist."

" 10. Mehan having no duties in connection with the electrical part of the work, the existence of the trouble in regulator No. 10 and the fire was notice to put him on his guard and to keep away."

" 16. Upon the evidence in the case the jury would not be warranted in finding that the plaintiffs in the case were dependent for support upon the wages of the deceased at the time of his death."

The judge refused to make any of these rulings, and also refused to make a ruling numbered 15 which afterwards was waived by the defendant. The eleventh ruling requested which the court held to have been given in substance is printed in a footnote on page 61.

The jury returned a verdict for the plaintiffs in the sum of $1,500; and the defendant alleged exceptions.

*W. H. Bent,* for the defendant.

*W. A. Hogan,* for the plaintiffs.

LORING, J.   1.   We are of opinion that the seventh and tenth rulings asked for were rightly refused.

The defendant's first contention in support of these rulings is that there was no evidence showing due care on Mehan's part even if he had a right to be where he was, and the case comes within such cases as *Cox* v. *South Shore & Boston Street Railway,* 182 Mass. 497, and *Clare* v. *New York & New England Railroad,* 167 Mass. 39, 40.   But it is to be noted that the iron pillar from which Mehan received the fatal shock was but three inches from the engine room floor on which Mehan was standing at the time, and while it is true that the evidence did not warrant a finding that the shock was received before Livesey had passed through the opening made by pushing back the upper bar, it did warrant the finding that it was received within a few seconds after he had done so.   The jury were warranted in finding that Mehan and Armstrong helped Livesey in pushing the bar through the socket on the wooden post, that Livesey rushed through the opening so made, with his sand pail, to the regulator in question, some twenty feet from the bar, and was in the act of throwing the sand on this regulator when Mehan received his shock.   If the emergency justified and required Mehan to be where he was, the evidence in our opinion warranted a finding that Mehan was in the exercise of due care.

And we are of opinion that the jury were warranted in finding that the emergency did justify and require Mehan to be where he was.   The emergency in question was described by Mehan's superior, the engineer, as follows: " a report like thunder, only it was not like thunder, and a flash like a flash of lightning. . . . The third regulator from me was smoking, and a little flame coming out of one corner was on the chain cable leading up to the side ; it looked like two tapers ; the tape insulation was burning."   This happened at 6.45 in the morning, when there were but three persons in the building, the switchboard tender, Livesey, the engineer, Armstrong, and the oiler, Mehan, whose death is the subject of this action.   Mehan immediately rushed to the bar, which had to be unscrewed and pushed through the socket before Livesey could get into the electrical enclosure on the floor in question, and Armstrong followed, after seeing to the engine which then was running.   The evidence warranted the finding

that all three took part in getting the bar out of Livesey's way. In our opinion the question whether that emergency justified and required Mehan to give the assistance which he gave was for the jury, although he was employed to oil the engines. See *Somerset & Cambria Railroad* v. *Galbraith*, 109 Penn. St. 32; *Terre Haute & Indianapolis Railroad* v. *Fowler*, 154 Ind. 682; *Pullman Palace Car Co.* v. *Laack*, 143 Ill. 242; *Sears* v. *Central Railroad & Banking Co.* 53 Ga. 630.

This conclusion is fortified by the testimony of Mehan's immediate superior, Armstrong the engineer, that "in case of fire as I understood it his duty was to assist in putting it out if possible," and by the fact testified to by Livesey that there was a fire four or five weeks before the accident here in question, which he (Livesey) assisted in putting out, and "Armstrong and Mehan were there assisting."

The defendant's last contention is that no reason is disclosed why Mehan took hold of the post, if he did, and no invitation for him to do so. The post was but three inches away from the engine floor · where the emergency called Mehan, and he might unintentionally have come in contact with it.

· 2. We are of opinion that the jury were warranted in finding that the defendant was negligent, and that the accident was caused by its negligence. We assume that the defendant was not liable for grounding the iron framework of the switchboard gallery by carrying from it a copper wire to a metal plate buried in the ground, in place of connecting it with the water pipes, because the former method was in common use although not so good a method as the latter. But the jury were warranted in finding that the company knew from the shocks received on the day before the accident by the masons then at work in the basement, that the system in use was not in fact carrying off the electricity which found its way into the framework, and that it was negligent in continuing under these circumstances without giving notice of the danger, and that that negligence caused Mehan's death because the current in the iron post took the line of least resistance through his body and the engine room floor to the water pipes. For these reasons the first ruling was in our opinion rightly refused.

3. The eleventh ruling * asked for was given in substance. The presiding judge told the jury that: " The law does not say that because an accident happens therefore the employer was liable, that would be reasonable if he was an insurance company, but it is not so.   But it assumes an employer to discharge his duty reasonably, with reasonable care, to see the machinery is in proper condition, as would be safe from injury or death ; would discharge that duty just as you or I in his place would do." The word " assumes " would seem to be a misprint.   However that may be, in answer to a question from the defendant at the close of the charge as to whether he gave this ruling the presiding judge added : " I have said to the jury, without your limitations, as I understand it, that the mere occurrence of an accident would not be evidence of negligence.   That is more general than the request, and therefore carries it."

4. The other contention made by the defendant is that the evidence did not warrant a finding that the father and mother of the deceased were dependent on him for support within R. L. c. 106, § 73.

It is settled that partial dependence is enough.   *Mulhall* v. *Fallon,* 176 Mass. 266.   *Welch* v. *New York, New Haven, & Hartford Railroad,* 176 Mass. 393.   *Boyle* v. *Columbian Fire Proofing Co.* 182 Mass. 93.   The case relied on by the defendant (*Hodnett* v. *Boston & Albany Railroad,* 156 Mass. 86) was a case where it did not appear that the plaintiff did not support herself by her own wages.   See *Mulhall* v. *Fallon,* 176 Mass. 266, 267.

The evidence warranted a finding that at the time of the son's death the family consisted of father, mother, two daughters and one son in addition to the son whose death is the subject of this action.   The son whose death is here in question was killed on December 11, 1903.   The father and mother had no property and no money in bank.   The father was seventy and the wife sixty years old.   The father seems to have had no regular

---

* The ruling requested was as follows :  " 11. In the present condition of the science of electricity as applied to electric lighting plants in the absence of other evidence of negligence on the part of the defendant the mere occurrence of the accident in this case is no evidence of actionable negligence on the part of the defendant corporation."

work; he testified that he "worked for Mr. Rose from May until November and received fifteen cents an hour, averaged nine hours a day, averaged five days a week. In the winter I got ten dollars a month for Currier's furnace and three dollars and a half a week for Rose's furnace." The father also testified that his "wife is not an invalid; she is n't very well now"; and she testified that she "had suffered for a long time from neuralgia; sometimes could not perform household duties." Jennie, the younger daughter, had not worked for two years, but had stayed at home and helped her mother in conducting the household; she "did the ordering." Joseph had entered the Tufts Medical School in October, 1902, and since then had lived at home and had his breakfast and supper there while the school was in session, and apparently all his meals during vacation. He worked during the four months' summer holiday. During this time he had received nothing from the family except his lodging and the meals mentioned above, and had contributed nothing to its support. The daughter Mary worked "in the Hamilton," and received from $7 to $8 a week. The son who was killed received $12 a week, which he handed to his mother. The mother testified that since the accident "My family remains the same now with the absence of the one who is killed. We live in the same house, pay the same rent, live as comfortably as we can; we have plenty to eat and drink and wear, and a house to live in." The surviving brother testified that "Mary has had a slight increase in pay since my brother was killed." The father "kept some pocket money, two dollars a week." Subject to this the earnings of the three wage earners, aggregating about $24, were given to the mother for the support of the family of six and the personal expenses of the five, not including Joseph, who was in the medical school and supported himself.

To find for the plaintiff the jury had to find that apart from the board and lodging of Joseph who was in the medical school, the parents were under all the circumstances dependent, in part at least, upon the son who was killed. There was no reason why the expense of Joseph's board and lodging should be charged wholly against the son rather than against the daughter who worked. We do not think that his presence in the family was fatal. Neither do we think the fact fatal that the family

had since lived in the same house. It appeared that since then the daughter had. had a slight increase of pay. But apart from that, having in mind the age and the lack of permanent employment of the father and the facts that for the short time which had elapsed since the death of the son the clothing probably had not had to be renewed but would have to be renewed in the future, and that for the remaining family (except Joseph) all that there was left were the earnings of the father and the one daughter, we are of opinion that the jury were warranted in finding that the parents were dependent, at least in part, on the son who was killed; and that for these reasons the first ruling asked for was rightly refused. We do not find in the bill of exceptions the seventeenth ruling referred to in the defendant's brief.

*Exceptions overruled.*