PHILOMENA C. MORENA *v.* JAMES O. WINSTON & others.

Middlesex. January 8, 1907. — February 28, 1907.

Present: KNOWLTON, C. J., MORTON, LORING, BRALEY, & SHELDON, JJ.

*Negligence,* Employer's liability *Evidence,* In rebuttal. *Practice, Civil,* Conduct of trial, Exceptions, Judge's charge.

In an action under R. L. c. 106, § 73, by the mother and only next of kin of a boy seventeen years and six months of age, for causing his instantaneous death, if it appears that the deceased had come from Italy and had been in this country only two weeks, that his father had died in Italy six years before, leaving the plaintiff as his widow wholly without means of support, that during the two years before the deceased came to this country he had worked for fifteen cents a day which he gave to the plaintiff and which was her only source of income and that he came to this country to get money for her support, there is evidence for the jury that the plaintiff at the time of the death of the deceased was dependent upon his wages for support within the meaning of the statute.

In an action under R. L. c. 106, § 73, by the next of kin of a boy seventeen years and six months of age, for causing his instantaneous death while employed in a stone quarry of the defendant, from a stone falling upon him owing to the breaking of a chain attached to a derrick by which it was being hoisted, if it appears that the boy had been in this country only two weeks and was employed by the defendant to assist a certain workman who was running a steam drill at the quarry near the derrick by doing what he was told to do by this workman, to whom the duty of instructing him had been delegated by the defendant's superintendent, and it can be found that under the instructions so given to him he had a right to expect that stones would not be swung over his head without a warning cry first being given, and if there is evidence that on this occasion no such warning was given, the question of the due care of the deceased is for the jury, as also is the question whether he had assumed the risk of such an accident.

In an action under the employers' liability act against the proprietor of a stone

quarry for causing the death of an employee of the defendant through a defect
in the condition of the ways, works or machinery of the defendant, if it appears
that the death of the employee was caused by a stone falling upon him as it was
being swung over his head by a derrick owing to the breaking of a defective
link in the chain by which it was suspended, and that the weakness of the link
was due to its having been overheated when welded by a servant of the defend-
ant so that its structure became crystallized to a dangerous degree, and there is
evidence on which it can be found that the defect in the link might have been
discovered by inspection and that no inspection was made, the question of the
defendant's negligence is for the jury.

A workman in a stone quarry does not assume the risk of injury from a stone
falling upon him owing to the breaking of a defective link in a chain by which
it is being hoisted if the defect is unknown to him and is due to the negligence
of a servant of his employer in overheating the link when welding it.

An exception to the admission by a presiding judge of evidence in rebuttal cannot
be sustained unless the excepting party shows that the evidence was not ad-
mitted merely as a matter of discretion.

Language of a presiding judge in his charge to a jury, which may be open to criti-
cism, gives no ground for exception if the judge after hearing the objections
to the charge finally leaves the case to the jury correctly in unmistakable
language.

Tort under R. L. c. 106, § 73, by the mother and next of kin
of Leonardo Morena, dependent upon his wages for support, for
causing his instantaneous death without conscious suffering on
May 26, 1904, while he was employed in the stone quarry of the
defendants at Westford, from a stone falling upon him owing to
the breaking of a chain attached to a derrick by which it was
being hoisted, with four counts respectively alleging a defect in
the condition of the ways, works or machinery of the defendants,
the negligence of a superintendent in failing to examine the
chain, the failure of the defendants to furnish the deceased with
a safe and suitable place to work, and the negligence of a super-
intendent in failing to warn him that the stone was suspended
over his head.　Writ dated August 9, 1904.

At the trial in the Superior Court before *Aiken*, C. J., it ap-
peared from evidence offered by the plaintiff that she was the
mother of Leonardo Morena ; that her husband, the father of
Leonardo, had died some six years before Leonardo left Italy to
come to this country; that for four years after her husband's
death she had no income whatever and lived without any
from any source ; that two years before Leonardo left Italy he
had worked for fifteen cents a day, which he gave her, and
upon which she and her children lived; and that she had no

other source of income. She testified that Leonardo came to this country to get money for her support. It appeared that one Capuana sent money to Italy to pay the passage of Leonardo to this country. At the request of Capuana, who then was employed by the defendants at Fletcher's quarry, the superintendent, one Blades, employed Leonardo. He worked at the quarry from Wednesday of the week preceding his death to the date of the accident, May 26, 1904, and received as wages $10. This was the only amount which he received as wages in this country and this was due from him to Capuana and was collected by Capuana and retained by him on account of this debt.

Capuana, called by the plaintiff, testified that on May 26, 1904, he was working in the quarry of the defendants at Westford; that he had worked there for three summers; that Leonardo Morena was his brother in law, who had been in this country a little over two weeks before he was killed, having come from Italy; that Morena was staying at his house in Westford, and was seventeen years and six months old; that the witness had sent money to Italy for his passage, and when Leonardo arrived in this country Capuana asked Blades, the superintendent of the quarry, to give Leonardo a job; that Capuana at that time was running a steam drill at the quarry near the derrick; that the derrick was on a bank about twelve feet higher than where he was, and sixty feet away, and was being used for hoisting stones from the ledge to a place on the other side of the quarry, where they could be worked upon by the stone-cutters; that Blades told him to bring Leonardo the next day and he would put him on with him to help on the drill; that he brought Leonardo the next day, and Blades told him to go to work with Capuana; that he took him down with him to the drill and was with him all of the time; that Leonardo went to work with him in the morning and went back with him at noon, and went back to work in the afternoon and then back home; that his duties were to do what Capuana told him, such as to get water when Capuana told him he needed it; that the stone drill that he was operating had been in the same spot it was when Morena was killed for four or five days before the accident; that Leonardo was there all those days and had been working for the defend-

ants about two weeks, and had worked during all this time with Capuana; that usually there was a shout of "Heads up" when a stone was moved over their heads, and when any one said "Heads up" they looked around and saw what was going on and got out of the way; that just before Leonardo was killed Capuana was setting up the drill, had the drill in the hole, had the wrench in his hand to tighten it up, and had told Leonardo to get a little water; that he was not far off; that then while he was tightening it up with the wrench he saw the stone drop; that he did not know what Leonardo was doing at the time he was struck; that he had got the water and left it between the legs of the derrick, and was himself between the legs of the derrick watching Capuana to learn the work while he was getting ready to tighten up the wrench; that the first thing Capuana knew the stone came right down and struck a blow to the drill, and one of the legs of the drill struck him softly on the leg; that he heard no warning, and heard no one say anything; that the stone was on top of Leonardo when he looked; that he appeared dead; that they were quarrying stones a short distance away; that he saw the stone; that the stone was from about two and a half to three feet long; that over his head he saw the derrick and a piece of chain hanging on the block of the derrick, and saw the other part of the chain on the stone.

The conclusions of fact warranted by the evidence are stated in the opinion.

At the close of the evidence the defendants asked the Chief Justice to direct a verdict for the defendants and asked him to make certain rulings. The Chief Justice refused to order a verdict for the defendants or to make the rulings requested, and submitted the case to the jury on the first and second counts under the employers' liability act.

After the counsel for the defendants had objected to certain instructions in the charge, the Chief Justice further charged the jury as follows:

"Gentlemen, the only fault in the case for which there is responsibility in this case is overheating. There is a claim that there was a fracture existing in the chain that is not due to overheating. If you are not satisfied that the overheating was the cause of this accident your verdict is for the defendants. I

want to have this plain. The case, as it is left to you by the plaintiff in this case, depends upon the overheating of the chain. You must be satisfied that the overheating of the chain left the iron in such a condition that the accident occurred. Unless you are satisfied of that your verdict is for the defendants.

"If the fracture, if there was one that existed, arose from any other cause than overheating, there is no right on the part of the plaintiff to recover. In other words, the plaintiff's case depends upon making out the proposition that the iron was overheated, and that that left the iron in such a condition that the link broke and caused this accident; and unless that is established there is no right in this case to recover."

The jury returned a verdict for the plaintiff in the sum of $2,250; and the defendants alleged exceptions to the refusals to order a verdict for them and to make the rulings requested, and to the instructions given at variance with such requests, and also to the allowance of certain questions put to one Blodgett and to one Fairbairn when called by the plaintiff in rebuttal.

*J. T. Connolly*, for the defendants.

*F. J. Maloney*, for the plaintiff.

SHELDON, J. In our opinion there was evidence upon which the jury had a right to find for the plaintiff. The case was submitted to them only on the first and second counts of the declaration; and the judge finally ruled in unmistakable language that the only negligence for which the defendants could be held liable was the furnishing of a chain in which the link that broke and thus caused the accident had been overheated by the blacksmith (who was the defendants' servant) in welding it, so as to weaken it and make it unfit for use. There seems to have been no dispute that this link was welded by the defendants' servant; that the chain then was furnished by the defendants to their derrickmen, to be used in hoisting stone; and that this link broke under the weight of a stone which was being hoisted, and thus caused the accident. There was evidence on which it could be found that this link was overheated and thereby so weakened as to cause the accident, and that this defect in the link might have been discovered by proper inspection. The jury now must be taken to have found that these facts were proved; and also that the deceased was himself in the exercise

of due care and had not assumed the risk of the accident which happened; and that the plaintiff was dependent upon his earnings for support. It seems to have been conceded that proper notice was given; that the deceased died without conscious suffering; and that the plaintiff was his only next of kin. Accordingly the verdict for the plaintiff must stand unless some one or more of the defendants' specific objections are found to have been well taken and to be material.

1. The question whether the plaintiff was dependent for support upon the wages of the deceased, her son, properly was left to the jury. *Boyle* v. *Columbian Fire Proofing Co.* 182 Mass. 93, 100. *Mulhall* v. *Fallon*, 176 Mass. 266, and cases there cited. Apparently she had no other means of support, and this is more than enough to satisfy the statute. *Mehan* v. *Lowell Electric Light Co.* 192 Mass. 53. *McNary* v. *Blackburn*, 180 Mass. 141, 144. *Houlihan* v. *Connecticut River Railroad*, 164 Mass. 555. The case differs from *Hodnett* v. *Boston & Albany Railroad*, 156 Mass. 86.

2. There was evidence that the deceased was in the exercise of due care. He was in Capuana's immediate presence, ready to assist him, as it was his duty to be. The instructions which he had received from Capuana, to whom the duty of instructing him had been delegated by the defendants' superintendent, are to be treated as if they had been given by the defendants themselves. *Dolan* v. *Boott Cotton Mills*, 185 Mass. 576, 581. *La Fortune* v. *Jolly*, 167 Mass. 170. *Bjbjian* v. *Woonsocket Rubber Co.* 164 Mass. 214, 220. But under these instructions it might be found that he had a right to expect that stones would not be swung over his head without a warning cry first being given, and that it was not careless for him to act upon this expectation. For the same reasons it cannot be said as matter of law that he had assumed the risk of such an accident, though doubtless the jury might have found that this was the fact. *Garant* v. *Cashman*, 183 Mass. 13, 18. *Graham* v. *Badger*, 164 Mass. 42, 48.

3. There was evidence of negligence for which the defendants were responsible under the provisions of R. L. c. 106, § 71. The jury might have found that the chain which broke was furnished by the defendants to be used with the derrick, constituting with

the derrick the machinery or instrumentality intended to be used in moving stones out of the quarry to the place in which they were to be wrought. It was like the rope which was used with a derrick in *Graham* v. *Badger*, 164 Mass. 42, 48, and which is there spoken of as one of the defendant's "permanent appliances." They furnished this chain to be used as a permanent instrumentality for the very purpose and in the very manner in which it was being used. *Haskell* v. *Cape Ann Anchor Works*, 178 Mass. 485. They are not excused by the fact that they bought their chains from reputable makers; for the jury might have found (if indeed this question was in dispute) that not only was the link which broke weak and unfit for use, but that this weakness was due to a fault of the defendants' servant whom they had entrusted with the duty of preparing and fitting it for use in allowing it to become overheated so that its structure became crystallized to a dangerous degree. It was their duty to provide reasonably safe and proper appliances and machinery for the conduct of their business so far as this could be secured by the exercise of proper care; and if they chose to delegate the performance of this duty to one of their servants they became responsible for his negligence both under the statute and at common law. R. L. c. 106, § 71, cl. 1. *Boucher* v. *Robeson Mills*, 182 Mass. 500. *Haskell* v. *Cape Ann Anchor Works*, 178 Mass. 485, 486, 487. *Moynihan* v. *Hills Co.* 146 Mass. 586, 591, *et seq. Cushing* v. *Smith Iron Co., ante,* 310.

The defendants, under the instructions given to the jury, could not have been held for any negligence of the derrickman in failing to give the usual warning to his fellow servants, or in selecting a weak chain when a sufficient number of suitable chains had been provided; and the cases of *Johnson* v. *Boston Tow-Boat Co.* 135 Mass. 209, and *Harnois* v. *Cutting*, 174 Mass. 398, are not applicable. See *Ford* v. *Eastern Bridge & Structural Co.* 193 Mass. 89.

There was evidence on which the jury could find that the defect in this link might have been discovered by inspection, but that no inspection was made. Indeed, the defendants do not assert that any inspection was made; they contend that there were no practicable methods of inspection, and that the methods suggested by the plaintiff in the testimony put in would offer no

protection to their servants.  But this was plainly a question for the jury.  *Harris* v. *Putnam Machine Co.* 188 Mass. 85.  *Murphy* v. *Marston Coal Co.* 183 Mass. 385.   *Toy* v. *United States Cartridge Co.* 159 Mass. 313.

The jury might well have found that the direct and proximate cause of the accident was the breaking of the chain through the weakening caused by the overheating of the link which broke. The risk of the existence of such a defect, unknown to the servant, is never assumed by him.  *Hopkins* v. *O'Leary*, 176 Mass. 258, 264, and cases there cited.  And, even if the jury might have found on the evidence that the breaking of the chain was due not to the weakening of the link but either to a former fracture or to some other cause, yet under the instructions given to them it is manifest that they have not done so.

4. The presiding judge had a right in the exercise of his discretion to admit in rebuttal the testimony of Blodgett and Fairbairn, and the bill of exceptions does not show that this evidence was not admitted as a matter of discretion merely.

5. It may be that some of the language used in the charge was open to criticism ; but the defendants have no right to complain of this, in view of the manner in which the case finally was left to the jury.

We have considered all the questions which have been argued for the defendants.  It is not necessary to take up specifically the many different requests for instructions which were presented.  They all are disposed of by what has been said.  There was no material error at the trial.

*Exceptions overruled.*