MARIA SAURES, administratrix, *vs.* STEVENS MANUFAC-
TURING COMPANY.

Bristol.     October 28, 1907. — November 26, 1907.

Present: KNOWLTON, C. J., MORTON, BRALEY, SHELDON, & RUGG, JJ.

*Practice, Civil*, Exceptions. *Evidence*, Presumptions and burden of proof, Circumstantial. *Agency*, Scope of employment. *Negligence*, Employer's liability.

An exception to a refusal by the judge presiding at a trial before a jury to direct a verdict for the defendant will not be sustained if there properly was before the jury any evidence upon which the questions at issue could be submitted to them.

A jury is not bound to accept the testimony of a witness as true, even though it is uncontradicted.

At the trial of an action by one employed in a quilt factory against his employer for injuries alleged to have been caused by defective insulation about an incandescent electric lamp, a question at issue was whether, at the time of his injury, the plaintiff was acting within the scope of his duties. There was evidence tending to show that he was a helper about the factory, that, on the morning of the accident, a rat was observed in the bleaching room, that the second hand, who was in charge of that room in the absence of the overseer, told him to catch the rat, that the rat went through a hole in the floor and fell into a vat in the cellar which contained quilts, that the plaintiff thereupon in the presence of the second hand put on his working clothes and went into the cellar alone, that there he took hold of the electric lamp in question, which the men were accustomed to use as a portable lamp around the cellar, intending to use it to

search for the rat; and received the injuries complained of. *Held*, that there was evidence for the jury on the question whether the plaintiff was acting within the scope of his duties.

At the trial of an action by one employed in a quilt factory against his employer for injuries alleged to have been caused by defective insulation about an incandescent electric lamp which, within the scope of his duties, the plaintiff was using when injured, it appeared that no one saw the accident to the plaintiff but that, after the accident, he was found lying unconscious with one hand badly burned and the other slightly burned, and that the lamp, with its glass bulb broken, lay near him. There also was evidence tending to show that the lamp, while not made for use as a portable lamp, commonly was used as such by employees of the factory, and that the plaintiff, when injured, had taken hold of the wire immediately above the lamp with his right hand, and, when it burned him, had seized it with his left hand, and that then he became unconscious. *Held*, that it could not be said as a matter of law either that the plaintiff was not in the exercise of due care or that he had assumed the risk of the injury.

At the trial of an action by one employed in a quilt factory against his employer for injuries alleged to have been caused by defective insulation about an incandescent electric lamp which, within the scope of his duties, the plaintiff was using when injured, there was evidence tending to show that two other employees in the factory had received shocks in using the lamp three or four weeks before the accident to the plaintiff but had not reported the fact to any one, that the chief engineer and electrician of the defendant, who had installed the lighting system, tested the wires for defects only by looking at them with a torch or candle weekly, but it was not certain that he made such test the week before the accident, that proper tests to discover the defect alleged would have been by the use of apparatus specially made for such purpose, and an expert testifying for the defendant stated that a weekly test of that nature would be ample and desirable, but that a weekly test should not be omitted until after systematic weekly tests for a number of months. *Held*, that there was evidence of defective insulation due to negligence of those entrusted by the defendant to see that the insulation was in proper condition.

TORT, under R. L. c. 106, § 71, cl. 1, and § 72, by the administratrix of one Antone Saures to recover for the conscious suffering and death of the intestate alleged in the third count of the declaration, which was the count upon which the action was tried, to be due to defective insulation of a wire used for conducting electricity. Writ in the Superior Court for the county of Bristol dated September 22, 1905.

There was a trial before *Schofield*, J. It appeared in evidence that the accident to the plaintiff's intestate occurred in a factory of the defendant where it was engaged in the manufacture of bed quilts. On the morning of the accident, when Antone Saures, the plaintiff's intestate, arrived at the mill, a rat was discovered on the floor of the bleach house, and when certain of the men, including Saures and one Henry Heddleston, who the plaintiff

contends had authority over her intestate, gave chase to it, it disappeared through a hole in the floor used for the purpose of allowing cloth to be passed into a vat or " sour pit " in the cellar below.　Upon the disappearance of the rat, Saures went to another part of the room, put on his working clothing, and was seen going in the direction of the stairs leading to the cellar. Subsequently he was discovered lying on the floor of the cellar near the vat above mentioned in an unconscious condition with his left hand very badly burned, and with a slight burn on the right thumb and a slight burn or abrasion on the chest, and an incandescent electric lamp was found on the floor of the cellar near him, the glass bulb of which was broken.　There was considerable water on the floor of the cellar, and the vats contained an acid mixture in weak solution.

The evidence, besides that stated in the opinion, with regard to whether or not Saures was acting within the scope of his duties when he was injured was as follows : One Correira testified that a man whom he called Fred was the " first boss," and that, when he was not there, the " second hand," whose name was Henry, gave orders to the men.　Saures did " lots of work," helped the men wash spots and sometimes he would " go and mangle water," and acted as interpreter between the workmen, who were Portuguese, and the bosses.　When the rat was discovered in the bleaching room, Saures, the second hand, and he, Correira, were in the room.　The first boss was not there.　The witness heard all " holler," " Catch the rat," and heard the second hand say that and, " Antone, catch the rat."

Henry Heddleston, called by the defendant, testified that he was the second hand in the bleaching room, that he gave Saures no orders about the rat and did not exclaim " Catch it " or any such words at the time and heard none so exclaim.　The rat would have done very little harm in the vat.　He did not go down to get it out because he expected it would jump out.　No part of Saures' work required him to go into the cellar.　He never told any one to use the electric light which caused the injury and did not know that any one was in the habit of using it as a portable light, but he had no charge of any of the factory outside of the bleaching room ; the first boss had charge of the wash room and cellar, where the light was.

Fred Hathaway, testifying for the defendant, stated that he was overseer of the factory. He did not think it was important in any way in the interest of the mill to send any one down to catch the rat. He gave no directions to any one to use the light in question as a portable light, and never saw any one so using it.

It appeared that one Cobral and one Rezeins were assigned from time to time to the task of cleaning the vats in the cellar. Their testimony, referred to in the next to the last paragraph of the opinion, was to the effect that they used the lights in the cellar as portable lights and that, about three or four weeks before the accident to the plaintiff's intestate, they both received shocks from the same lamp that was alleged to have been the cause of his injury, but that they did not report the matter to any one.

One Dunlap testified that, at the time of the accident to the plaintiff's intestate, he was chief engineer and electrician of the defendant and had put in the system of lighting of which the lamp in question was a part. His testimony, referred to in the next to the last paragraph of the opinion, was to the effect that he had examined the wires and the lamp in question immediately after the accident, but that he did not find any defect. He stated that he examined the lighting apparatus every Sunday to see if it was in proper condition, going over it with a torch or a candle, but that he could not be sure that he did so the Sunday before the accident.

One Hart, testifying for the plaintiff as an electrical expert, stated that in his opinion the insulation " at the lamp " in question was defective at the time of the accident, and that this defect could have been discovered by use of tests with a " static ground detector " or " an instrument that is plugged in from time to time."

One Clifford, testifying for the defendant as an electrical expert, stated that in his opinion weekly tests in a cellar like the one where the lamp in question was (damp, with vats containing an acid mixture), would be ample and desirable. If he wanted to be very careful he would use the " volt meter test." If he found that the weekly tests when systematically carried out were showing no particular trouble he should say that tests

certainly were not required any oftener than once a week, and might feel that it was perfectly allowable to let those tests go over two weeks, but before he decided to extend the period beyond a week he would want to make systematic weekly tests, if he were the operating engineer, for a number of months.

At the close of the evidence, the defendant made the following requests for rulings:

1. On all the evidence in the case the plaintiff is not entitled to recover.

2. There is no evidence of the defendant's negligence and therefore the plaintiff is not entitled to recover.

3. There is no evidence of the due care of the plaintiff's intestate and therefore the plaintiff is not entitled to recover.

4. It was not a part of the duty of the plaintiff's intestate to use the electric light; in so doing he exceeded his instructions and therefore the plaintiff is not entitled to recover.

5. There is no evidence that the plaintiff's intestate was properly in the cellar in the vicinity of this electric light.

The presiding judge refused to rule as requested, and the defendant excepted. The jury found for the plaintiff.

Other facts are stated in the opinion.

*R. P. Borden,* for the defendant.

*J. W. Cummings,* (*C. R. Cummings* with him,) for the plaintiff.

SHELDON, J. The verdict in favor of the plaintiff was rendered upon the third count of her declaration; and it is only upon that count that the questions raised by this bill of exceptions are to be considered. They arise upon the defendant's contention that the plaintiff's intestate, Antone Saures, was acting outside the scope of his employment and not as a servant of the defendant when he was injured; that he was not shown to have been in the exercise of due care; and that there was no evidence that his injury was due to negligence on the part of the defendant. The case is a close one as to each of these questions; but if there was any evidence upon which they could be submitted to the jury we cannot revise the finding which has been made. *Hayes* v. *Moulton,* 194 Mass. 157, 163, 164.

1. There was evidence upon which the jury could find that Saures, the plaintiff's intestate, was employed by the defendant

in its bleaching room, to clean up and do general work; that on the morning of the accident a rat was found in the bleaching room, and that Heddleston, the second hand, who was in charge at the time, gave an order to catch the rat, but the rat got through a hole in the floor into a vat in the cellar, in which cloth was being soaked and cleansed in an acid mixture; that Saures, seeing this, in order to prevent the cloth from being spoiled, took off his clothes, put on his overalls, went into the cellar, and, for the purpose of getting the rat out of the vat, took an electric light which hung from the ceiling of the cellar and which the men were accustomed to take and carry around the vats; and that he was injured by a shock of electricity from the lamp or its wires, which caused his death. The testimony to these facts consisted mainly of statements of Saures himself, admitted apparently without objection under R. L. c. 175, § 66.

The defendant's counsel has addressed to us an able argument in support of his contention that from these facts Saures must be deemed to have been a mere volunteer in going into the cellar to find the rat; that the order given by Heddleston to "catch the rat" was rather an ejaculation such as all the men were making than an order given in the conduct of the defendant's business; that if it could be considered an order it applied merely to the situation that existed while the rat was running about the floor of the bleaching room, and could not properly be interpreted as a command to go down cellar, take the light and fish the rat out of the vat, especially in view of the fact that the words were addressed to all present, but no one other than Saures went further than to join in the present pursuit of the rat in the bleaching room. *Gouin* v. *Wampanoag Mills,* 172 Mass. 222. *Desautels* v. *Cloutier,* 189 Mass. 349. *Bamford* v. *G. H. Hammond Co.* 191 Mass. 479.

But we are of opinion that this question was for the jury. It was for them not only to find whether what was said by Heddleston was an order to the men, but to determine its purport and meaning. They might say that the act of Saures in changing his clothes and going into the cellar was in the presence and met the approval of the second hand, and that this bore upon the scope of his previous order. And the defendant's con-

tention that Heddleston upon his own uncontradicted testimony had no authority over the cloth in this vat and no control over Saures, and so that the defendant was not bound by his order if given, is disposed of by the fact that the jury were not bound to accept this testimony even though uncontradicted. And Hathaway, the defendant's overseer, though called by it to testify, did not deny that Heddleston was the second hand, or that he gave orders in Hathaway's absence. It was for the jury to say whether this included a merely transient or temporary absence. And on the evidence it could not be said that Saures was not acting within the scope of his duty in taking the electric light to see whether the rat was still in the vat, and if so, to get it out. This whole question was for the jury, and the defendant's fourth and fifth requests were properly refused. *Patnode* v. *Warren Cotton Mills*, 157 Mass. 283, 287. *Mehan* v. *Lowell Electric Light Co.* 192 Mass. 53, 59.

2. Nor could the defendant's third request have been given. We already have seen that it could have been found that Saures was properly in the cellar and had a right to use the lamp. It also might have been found that this was a portable light, provided and intended to be used around the vats. The burns upon the plaintiff's hands and the absence of any such cuts as would probably have been caused by the broken glass if he had had the bulb in his hands and had thus broken it, would tend to indicate, in connection with the testimony as to previous leaks from the wires, that he did not have the bulb in his hands, but was using the lamp in the usual and ordinary way. Victoria Martins, a witness called by the defendant, testified to Saures' statement that he took hold of the wire and not of the bulb. Nor were the jury bound to believe that whenever a witness spoke of " the lamp " he referred to the glass bulb alone in contradistinction to the whole arrangement of wires, bulb and socket which together, according to common speech, constituted the lamp. While the evidence was no doubt meagre, it cannot be said that there was no evidence as to the cause of the accident within the rule of *McCarty* v. *Clinton Gas Light Co.* 193 Mass. 76, and cases there cited. Most of the specific contentions made here by the defendant were rather for the jury than for us. In our opinion this question was properly submitted to the jury.

*Meehan* v. *Lowell Electric Light Co.* 192 Mass. 53. And for the
same reasons and in view of the character of the risk and the
fact that Saures seems to have known nothing as to the condition
of the lamp or its connections, it cannot be said that he had
assumed the risk of the accident which happened.

3. The most difficult point in the case is upon the question of
the defendant's negligence ; but upon careful consideration of
the evidence stated in the bill of exceptions we are of opinion
that this question also was for the jury. If the plaintiff received
his shock directly from the wire, as the jury might have found,
this would indicate that there was a leakage of electricity re-
sulting from a defective condition of the insulation, the wiring,
or the electrical connections, or all of them. This would not
be enough to hold the defendant without further evidence of
its negligence. *Saxe* v. *Walworth Manuf. Co.* 191 Mass. 338.
*Meehan* v. *Lowell Electric Light Co.* 192 Mass. 53, 60. But
there was further evidence. From the testimony of Cobral and
Rezeins as to the shocks received by them, it might have been
found that the same defects had existed, though in a less serious
form, for three weeks before the injury to the plaintiff's intes-
tate. Upon the testimony of Hart, Clifford and Dunlap, it
might have been found that by proper tests the defect might
have been discovered and remedied, and that such tests ought to
have been made. The defendant's superintendent testified that
he did not know what insulating material had been used where
the wires entered the socket of this lamp, and could not state
whether there had been any inspection of this wire since its in-
stallation. Dunlap, the defendant's chief engineer and electri-
cian, testified that it was his practice to examine the electrical
apparatus with a torch or candle " to find out if there were any
loose connections, any pulleys rubbing against the wires, if there
were any wires too near to a pulley or too near to a pipe, and
for bare places in the wire." It cannot be said as matter of law
that such examinations came up to the standard of the system-
atic weekly tests which the defendant's expert witness Clifford
testified on cross-examination " would be ample and desirable."
Plainly it was for the jury to say both what inspections were
made and whether they were sufficient in number and in char-
acter. Accordingly the defendant's second request could not

have been given.   *Cahill* v. *New England Telephone & Telegraph Co.* 193 Mass. 415.

It follows from what has been said that the first request was properly refused, and the case was rightly submitted to the jury.

*Exceptions overruled.*