# VALVERDE *v.* VALVERDE

No. 3004

November 3, 1933.                                        26 P. (2d) 233.

*Cantwell & Springmeyer,* for Appellant:

*Platt & Sinai,* for Respondent:

# OPINION

By the Court, COLEMAN, J.:

Charles A. Valverde instituted this suit for divorce against Marie M. Valverde, on the ground of cruelty. The defendant has appealed from a decree in favor of the plaintiff.

To the complaint, which was filed October 16, 1930, alleging extreme cruelty committed after January 10, 1929, the defendant filed an answer denying the allegations of cruelty contained in the complaint, alleging as res adjudicata a decree of separate maintenance in behalf of this defendant and against this plaintiff, entered by the circuit court of Escambia County, Fla., a court of general jurisdiction, on January 10, 1929, in which the plaintiff herein was personally served with summons. The answer herein also alleged, as a third defense to plaintiff's cause of action, desertion by the plaintiff in 1927.

The defendant urges on this appeal several grounds for reversal, but, as we view the record, we need determine but one, namely, Does the evidence sustain the findings of the trial court to the effect that the defendant was guilty of extreme cruelty toward the plaintiff, resulting in injury to his health?

1. The plaintiff insists that there is such a conflict in the evidence that this court should not disturb the findings and judgment of the trial court. BIGELOW, C. J., in State v. Virginia & T. R. Co., 23 Nev. 283, 46 P. 723, 35 L. R. A. 759, in considering this contention, said: "That is undoubtedly the general rule, but for it to have this effect there must be a substantial conflict. It is not sufficient that there is some evidence

supporting the verdict, if it is so weak and inconclusive as not to raise a substantial conflict with that produced against it."

In Consolazio v. Summerfield, 54 Nev. 176, 10 P. (2d) 629, 630, we said: "The general rule of this court is that when the evidence is conflicting and there is substantial evidence to sustain the judgment it will not be disturbed. But there is an exception to the general rule to the effect that where, upon all the evidence, it is clear that a wrong conclusion has been reached, the judgment will be reversed. Reed v. Reed, 4 Nev. 395; Dalton v. Dalton, 14 Nev. 419; Watt v. Nev. Cent. R. R. Co., 23 Nev. 154, 44 P. 423, 46 P. 52, 726, 62 Am. St. Rep. 772; Burch v. Southern Pac. Co., 32 Nev. 75, 104 P. 225, 239, Ann. Cas. 1912B, 1166; Smith v. Goodin, 46 Nev. 229, 206 P. 1067; Walker Brothers Bankers v. Janney, 52 Nev. 440, 290 P. 413."

The parties were intermarried at Tacoma, Wash., in 1917, and the plaintiff, being a captain in the Regular Army, was transferred to Fort Barrancas, near Pensacola, Fla., in 1926, where the parties resided until some time in 1930, occupying during that time officers' quarters. On January 10, 1929, the defendant procured from the circuit court of Escambia County, Fla., a decree of separate maintenance from the plaintiff, upon the ground of extreme cruelty.

The plaintiff's case is predicated upon acts of extreme cruelty alleged to have been committed subsequent to January 10, 1929—the date of the Florida decree in favor of the wife.

2. In support of his alleged ground of divorce, the plaintiff testified that the defendant continued to live and have marital relations, including sexual intercourse, with the plaintiff against his wishes, in the officers' quarters furnished him by the government at Fort Barrancas, after the entry of the decree of January 10, 1929; that she refused to vacate the quarters; that their relations were strained; that she nagged him, and that she threatened to make, and did make, complaints against him to the commanding officer of the fort; that he had

to pacify her to prevent her making such complaints, which might result in his being court-martialed. He also testified that he was repeatedly subjected by defendant to humiliation at the officers' mess table, when she would say things designed to embarrass and humiliate him. He also testified that defendant made a habit of entertaining in his quarters people who were distasteful and objectionable to him; that he ordered defendant not to get his mail, but, contrary to his wishes, she did so and opened his business and official mail, causing him embarrassment and humiliation. Plaintiff also testified that defendant checked up on him, by telephone, at clubs and other places; that she compelled him to sign a note under threats that she would have him put in the local jail for failure to pay back alimony; that defendant would fly into a rage and go into hysterics; that on numerous occasions she attempted to inflict physical violence upon him, and on one occasion kicked him in the groin, bit and slapped him, and threatened him with a gun. He further testified that on dozens of occasions she threatened to commit suicide. He further testified that the defendant was incapable of making a home, and that his quarters were constantly unclean, unless he had them cleaned.

After detailing the alleged acts of cruelty mentioned, the plaintiff was asked what was the effect of the defendant's conduct upon him. He stated: "It saw me more and more embarrassed and humiliated, and rendered me less efficient professionally, and made me weary more quickly and caused an adverse effect on my health."

The defendant contradicted the plaintiff on every point as to the alleged acts of cruelty, and, while there is testimony by the plaintiff as to certain alleged conduct of the defendant, which in the very nature of things no one else could know of except the parties to the suit, his testimony is not corroborated by any witness, so far as it goes to the alleged cruelty. On the other hand, he impeaches himself, and he is contradicted by witnesses in behalf of the defendant. On the whole, we

are satisfied that his testimony is entitled to no consideration whatever.

Notwithstanding the fact that the plaintiff testified in the case that he and the defendant lived and cohabited together in the same apartments as husband and wife from January 10, 1929, until in January 1931, he filed an affidavit in the case on March 20, 1931, in resistance of her application for suit money, in which he swore that they had not thus lived together for three years. True, he testified that he did not intend to make such a statement in the affidavit, but he relied upon the affidavit for the purpose for which it was made, and it is hard to believe, in view of his intelligence and training, that he did not know what he was swearing to.

The defendant testified that she and plaintiff did not live together as husband and wife subsequent to September 1927. She also testified that after the entry of the decree of separate maintenance in January 1929, she asked the plaintiff for money he owed her, so that she could procure quarters elsewhere, and take her personal belongings, such as a piano, and a few other things, and that the plaintiff stated he was heavily in debt and could not make the payments; that he suggested that she occupy one of the apartments in the quarters where they were until November 1, 1929, when he would receive an increase in his salary of $100 a month, after which date he would voluntarily pay her $150 a month, instead of $125, as allowed by the court. She testified that the quarters assigned to the plaintiff consisted of two separate apartments, separated by a stairway and hall, and that, pursuant to plaintiff's suggestion, she occupied one and the plaintiff the other. She also testified that he said she would have no rent to pay there, and that there would be no fuel and light bill, as the government would furnish them free of charge; that, in the event she would stay there, she could live on $75 a month until he got his raise in November 1929. She testified that it was on those conditions that she continued in the apartment and lived separately from the plaintiff.

The plaintiff contradicted the foregoing testimony of the defendant, but, when a document was presented showing his signature and agreeing to pay the plaintiff $150 per month beginning November 1929, he admitted his signature to it, but claimed it was signed to pacify the defendant. This statement, to our minds, is the second writing, signed by the plaintiff, impeaching his testimony.

The plaintiff testified that between the 10th of January 1929, and January 1930, the defendant had taken his mail from the mail box without his consent, and denied having written her to forward his mail. In August 1929, while he was stationed at Camp Perry in Ohio for a few weeks, he wrote her: "Be sure to forward all of my mail except magazines and circulars, * * * " as appears from an exhibit. This is the third signed statement impeaching the plaintiff.

The plaintiff signed the defendant's name to certain documents, against her wishes and without her knowledge, she testified, while he testified it was with her consent; yet he found it necessary to imitate her signature. The natural inquiry is, Why was it necessary to imitate her signature if he had authority from her to sign?

On February 3, 1930, after the plaintiff came to Reno with a view of bringing suit for an absolute divorce, he wrote the defendant, pleading with her not to contest his suit. On a later date the plaintiff again wrote to the defendant, still endeavoring to influence her not to contest his divorce suit, so that he might marry a certain young lady to whom we will refer as Miss D, in which letter he said: "I admit that I have wronged you dreadfully, but, Mildred, on my sacred honor, I've wronged her a thousand times more than I have ever wronged you."

What a terrible confession for a prospective plaintiff in a divorce suit to make to his wife, whom he later seeks to convict of wronging him!

These incidents might seem enough to justify the conclusion that the plaintiff is self-impeached, and that

nothing more should be necessary to overcome his evidence. But a man's moral character is entitled to be taken into consideration in determining his worth as a witness in his own behalf. Let's consider the record with this idea in view.

According to the testimony the parties hereto were transferred to Fort Barrancas in July 1926. The plaintiff testified that for quite a time after he and the defendant went to Fort Barrancas, while they occupied two apartments that were assigned to him as an officer, they had but one bedroom and slept together. He admits that later they had two bedrooms, but does not remember when that arrangement began, and contends that continually up to January 1930, they lived as husband and wife.

The plaintiff admits that some time prior to 1929 he became infatuated with Miss D, and lead her to believe that he was an unmarried man. The uncontradicted testimony of the defendant is to the effect that for some time prior to the last date given the plaintiff admitted to her that he made presents to Miss D, including an engagement ring, and that plaintiff was corresponding with her; that he gave defendant letters from Miss D to read. He testified that he gave the defendant "dozens and dozens and dozens and dozens of letters" which he received from Miss D, to read. He admitted keeping up the correspondence with Miss D until after he came to Nevada in 1930. Again he testified that he gave the defendant a world of letters over a period of years, in an effort to make the defendant divorce him.

The wife's uncontradicted testimony is to the effect that the plaintiff told her he was going to have her declared insane. On December 14, 1929, plaintiff wrote the defendant a letter in which he stated that he had sworn affidavits of five men on the post to the effect that they had seen the defendant in most compromising positions with men late at night, and threatened to bring suit charging her with adultery, and to have her adjudged insane.

On December 17, 1929, he signed a writing in which

he stated that neither he nor any officer on post had made accusations against defendant, and that he did not believe the contents of any such affidavits were true. He testified on the trial that he made the retraction to save a scene.

What manner of a man is this captain in the Army of the United States? Men occupying such a position are supposed to be brave and gentlemanly.

What possessed him to threaten his wife with such terrible charges, and retract them within three days? What does such conduct show but lack of moral character? His own terrible confession as to his treatment of Miss D, coupled with his treatment, his confessed treatment, of his wife, shows he is lacking in moral fiber. Can the testimony of such a man be accepted, in any situation, particularly when contradicted in material detail by his wife and others? We think not. Not only is he contradicted by his wife, but by others. And right here let us say that it is a most amazing fact, if the plaintiff testified to the truth as to the alleged cruelty of his wife, that he did not produce a single witness to corroborate him as to such charges.

We might point out other features of plaintiff's own case which in our opinion show he is utterly unworthy of a divorce, or even of credit as a witness, but we will now briefly consider the evidence of some of the other witnesses.

The plaintiff is contradicted by Capt. Ernest A. Kindervater, who testified in reference to the quarters occupied by the parties during 1929. He said: "They occupied separate apartments in a building known as The Bachelor Officers' Building. A stairway and hall separated these apartments. They were situated on the second floor, each consisting of two rooms and a bath."

Mrs. Helen Epling testified that she lived at Fort Barrancas from January 1, 1928, to July 1, 1931; that the parties to this suit maintained two separate apartments, had separate telephones; that the defendant never made a scene in her and plaintiff's presence; that

defendant always behaved as a lady; and that she was sick a great deal, due to plaintiff's treatment of her. She testified that it was plaintiff's habit to thrust threatening notes, which she saw, under defendant's door, and that on one occasion she accompanied defendant home and saw such a note under the door; that she heard him say he did not care for social activities; and that defendant did not cause plaintiff embarrassment or humiliation.

Miss Josephine Cottrell, a witness in behalf of defendant, testified that she resided in Pensacola, Fla., and met the defendant in the spring of 1929, and the plaintiff later; that on several occasions she spent the night with defendant in her apartment, and that she never saw the plaintiff there. On cross-examination she testified that she knew the apartment was defendant's, because her name was on the door; that Capt. Valverde had other quarters, and that defendant occupied hers alone.

Mrs. Jessie Steel, a witness on behalf of defendant, testified that she had known the parties since some time in 1926; that, when she first knew them, they were living together as husband and wife; that for the first year of her acquaintance with them they seemed very nice to each other; that she never saw defendant display anger or violent temper toward plaintiff; that she had seen plaintiff display anger and violent temper toward defendant. In response to a question asking that she state the occasions upon which she observed such display of anger and violence, she stated: "It was too frequent an occurrence." She also testified that in 1928, while defendant was ill, the plaintiff took a three months' leave of absence. She also testified that, after the decree of separate maintenance was entered, the parties occupied separate apartments and were living separate and apart. This witness also testified, as did Mrs. Epling, that on one occasion defendant ran to her "showing signs of a struggle, and with unmistakable tooth prints on her shoulder."

We not only feel that the plaintiff has utterly failed to prove that the defendant was guilty of the acts with

which she was charged, but we are of the opinion that, if she were guilty of them, she was provoked to them by the vicious system of misconduct which he admitted in connection with Miss D. It is clear to our minds that he was so insanely infatuated with her that he did everything in his power, which he dared to do, to provoke the defendant to sue for an absolute divorce. A party cannot by his own misconduct drive his spouse to commit acts otherwise improper, and reap a reward for his vicious deeds, yet that is what the plaintiff has sought to do. The court in Kapp v. District Court, 31 Nev. 444, 103 P. 235, 238, quoted approvingly from Reed v. Reed, 4 Nev. 397, as follows: "Nor is a divorce ever granted where it appears that the party complaining willfully provoked the violence or misconduct complained of, unless such violence be extremely out of proportion to the provocation. Poor v. Poor, 8 N. H. 308, 29 Am. Dec. 664; Morris v. Morris, 14 Cal. 76, 73 Am. Dec. 631. Such is certainly a just and proper rule, for it would be revolting to every sense of right to award a divorce to a person founded upon the consequences of his or her own misconduct. * * * "

Furthermore, we do not think the testimony shows that the alleged acts of the defendant were such as to result in the impairment of his health. He said it had an adverse effect upon his health. That is too indefinite.

Again, we doubt, if what plaintiff testified to was in the main true, it would be sufficient to impair his health. Cruelty is a relative term. Its existence depends upon the character and refinement of the parties, and its determination must depend upon its own particular facts. What might be cruelty to one of refinement and of a sensitive nature would not be cruelty to one of a brutal disposition. Kelly v. Kelly, 18 Nev. 49, 1 P. 194, 51 Am. Rep. 732. We do not think the things charged to defendant would likely affect the health of one who would deliberately hand to his wife dozens and dozens of letters, as did the plaintiff, for the purpose he intended, nor to one who could accuse his wife of adultery and threaten her with charges of insanity, so baseless as to warrant his

signing a written retraction within three days. We might elaborate along this line, but think it unnecessary.

Other points are made, but, in view of the fact that the judgment and order must be reversed for insufficiency of evidence to sustain them, we need not consider the other points.

It is ordered that the judgment and order appealed from be reversed, and that the district court enter a decree finding that the allegations of extreme cruelty alleged in the complaint are untrue, and enter a decree in favor of the defendant, with costs in both courts.