JOHN L. NEISS, JR., administrator *de bonis non, vs.* MORRIS BURWEN.

Middlesex.     March 7, 1934. — June 25, 1934.

Present: RUGG, C.J., CROSBY, PIERCE, & LUMMUS, JJ.

*Negligence,* Employer's liability, Causing death. *Proximate Cause. Evidence,* Presumptions and burden of proof; Opinion: expert. *Witness,* Credibility. *Damages,* For tort. *Statute,* Revision. *Pleading, Civil,* Declaration.

At the trial of an action of tort by the administrator of the estate of an employee against his employer, who was not insured under the workmen's compensation act, to recover for conscious suffering and the death of the intestate resulting from an explosion of gasoline, there was evidence that the decedent, in starting an electrically operated gasoline pump of the defendant to pump gasoline into a tank wagon for the defendant, primed the pump by pouring gasoline into a pipe attached to it and left the cover of the pipe off; that the starting switch for the pump was in the same room; that the switch was defective; that the defendant knew of its condition and had not remedied it; and that a spark was formed in the switch which ignited gasoline vapor in the room and caused the explosion. A motion that a verdict be ordered for the defendant was denied. There was a verdict for the plaintiff. *Held,* that the motion properly was denied.

The jury who heard the action above described were not required to believe testimony by an electrical expert that it was impossible for the starting switch to emit a spark, especially where it was based upon an exhibit which was not the starting switch involved in the explosion; the jury were entitled to believe testimony by an eyewitness of the explosion that the starting switch emitted sparks.

The evidence at the trial of the action above described warranted a find-
ing that priming of the pump at certain times was necessary.  The
defendant contended that the proximate cause of the explosion was not
the spark emitted from the defective starting switch but the vapor
freed by the decedent in starting the pump with the priming pipe un-
covered;  but it was *held*, that the evidence warranted a finding that
the vapor might be freed by the mere act of priming, and that such a
situation was foreseeable as the cause of an explosion if an igniting
spark were in contact with the vapor.

The danger arising from the defective switch, in the circumstances above
described, could not properly be said to have been obvious to the
decedent at the time of the commencement of his employment;  and
therefore there was no warrant for a ruling that as a matter of law
there existed the so called contractual assumption of risk on the part
of the decedent.

Proof of partial dependence of the mother of the deceased employee on
him was sufficient proof of the dependency essential for the main-
tenance of the action above described under G. L. (Ter. Ed.) c. 229,
§§ 4, 7.

A finding of dependency of a mother upon an employee, necessary to be
proved to maintain an action under G. L. (Ter. Ed.) c. 229, §§ 4, 7,
for the death of the employee, was warranted by testimony of the
mother that she was dependent upon him, that she needed his money
for clothing and doctor's bills, that he gave her all his money except
when he needed it for his clothes, when she gave it back to him, that
her husband was working but that she did not receive from him enough
to support the family, and that she did not know exactly how much
the employee gave her.

The revision, in G. L. c. 229, § 9, of the statutes respecting recovery for
the causing of conscious suffering and the death of an employee was
not intended so to amend the law then existing that damages for
conscious suffering, as well as for causing the death, should be awarded
with reference to the degree of culpability.

The general rule, that verbal changes in the revision of a statute do not
alter its meaning and are construed as a continuation of the previous
law, applied to the revision above described.

The declaration in the action above described was in two counts, the first
under G. L. (Ter. Ed.) c. 229, § 7, to enforce the liability of the defend-
ant under that section for both personal injuries to, and the causing
of the death of, the employee;  and the second under the same section
to enforce the liability of the defendant for the conscious suffering of
the employee, based on the common law.  The judge instructed the
jury that damages under both parts of the first count were to be as-
sessed with reference to the degree of culpability.  There was a verdict
under the first count in the sum of $3,200 for the next of kin and of
$3,200 for the administrator.  The jury were instructed that the
damages under the second count were compensatory, and a verdict
was returned on that count in the sum of $5,000.  *Held*, that

(1) The trial judge erred in allowing, under the first count, the
assessment of punitive damages for both personal injuries and the
causing of death;

(2) The judge correctly admitted evidence of conscious suffering under the second count, and rightly ruled that damages for conscious suffering under that count were compensatory; but he was wrong in allowing the assessment of such damages in addition to the damages assessed for personal injuries under the first count.

(3) A new trial on the question of damages was ordered, at which damages under the first count were to be limited to the causing of the death.

As a matter of pleading, in an action against an employer for causing conscious suffering and the death of an employee, damages cannot properly be demanded for both the conscious suffering and death in a single count.

Damages for conscious suffering in such an action constitute one indivisible factor, whether the right to such damages is given by the common law or by the employers' liability act or by both.

TORT. Writ dated September 12, 1928.

In the Superior Court, the action was tried before *Gibbs,* J. Material evidence, rulings by the trial judge, and the verdicts are described in the opinion. The defendant alleged exceptions.

*G. M. Poland,* (*C. Hamilton* with him,) for the defendant.
*J. F. O'Connell,* (*J. A. Herbert* with him,) for the plaintiff.

CROSBY, J. This is an action of tort to recover for the conscious suffering and death of the plaintiff's intestate, Walter J. Neiss. The declaration, which is in two counts, alleges in the first that on the second day of September, 1928, the intestate, while in the employ of the defendant, suffered severe personal injury caused by a defect in the condition of the ways, works, or machinery of the defendant arising by reason of the negligence of the defendant, and that the existence of this defect was unknown to the employee; that as a result of the injury, the employee suffered severely and died, leaving surviving next of kin who were at the time of his death dependent on the wages of the deceased for support; that due notice of the time, place and cause of the injury was given to the defendant. The second count contains the same general allegations of the circumstances causing the injury and recites that the employee suffered great pain from the time of the injury to the time of his death. The answer was a general denial and an allegation of contributory negligence. The defend-

ant was not a subscriber under the workmen's compensation act. In his brief the defendant concedes that there was evidence on which general employment of the deceased by the defendant could be found during the summer of 1928.

There was evidence tending to show that the defendant operated several stations for the sale of gasoline and kerosene oil. A storage place in the yard of his residence, consisting of two underground tanks, one of which contained three or four thousand gallons of gasoline, was involved in the present case. Pipes led from the underground tanks to two pumps driven by an electric motor in a small wooden building in the yard. The tank wagon to be filled was driven outside of and near the building containing the pumps, and the gasoline was pumped out of the building in a pipe and into the tank in the yard. Electric current for the motor was furnished by the town's electric power service, on a wire line that entered the side of the building and passed along the side to a starting switch, which the plaintiff contends originated the spark that caused the fire. From the starting switch, the electric line led to the motor operating the pump. Between the side of the building where the line entered and the starting switch, there was a break in the line connected by a switch of the type commonly known as a knife blade switch, consisting of a handle fixed to two copper strips; when it was raised and pushed between other copper strips, connection was made in the line. There was another break in the line at the starting switch; this was connected or closed by moving the handle of the starting switch to the left and upwards. When the handle of the switch was down, the circuit or line was open; to operate the pump, after starting it by a hand wheel, the handle on the starting switch was moved to the left and upwards to a copper segment marked "start" and then farther up to a copper segment marked "run." At its highest position the handle was caught by a clutch which held it in the running position until the clutch was released by hand or by a magnetic or induction coil attachment, which released the clutch and allowed the handle, actuated by a strong

spring, to fall back to its lowest position when current ceased to flow through the line, for instance, by disconnecting the line or knife blade switch. The copper underface of the starting switch handle was of such width that, as the handle was being raised or lowered, its copper undersurface or shoe was in contact with the copper segments marked "start" and "run." One pump was used for gasoline and one for kerosene. The gasoline pump was farther away from the starting switch than the kerosene pump, and the handle of the starting switch was out of reach of one using the hand wheel of the gasoline pump and a rope was tied to the starting switch handle which led through a block fixed to the building, with the free end within the reach of the person operating the gasoline pump. The two pumps with the attached pipes were placed above the floor and each had a perpendicular pipe two inches in diameter, about two feet high, with the upper end closed by a square headed plug which screwed into the threaded top of the pipe. These pipes were for priming the pumps when necessary. If a pump had not been used for a long time, especially in cold weather, it was sometimes necessary to unscrew the plug from the top of the priming pipe, remove it and pour the priming fluid into the top of the pipe. If the pump was operated with the plug out of the priming pipe, after being primed with gasoline, the latter would be forced from the open top of the pipe.

The fire which caused the death of the deceased occurred about 11 a.m. on Sunday, September 2, 1928. There was only one eye witness to the start of the fire, one George Muse, who was called as a witness for the plaintiff. He testified that on Sunday morning the deceased asked him to go to Wilmington with him with a load of gasoline; that the witness went with the deceased on a tank truck to the residence of the defendant where the deceased drove the truck to a place near the building containing the pumps. Muse then testified as follows: "Well, he drove the truck right into the barn . . . and he got off of it and climbed up to the back of it and put this tunnel in it where the gasoline runs into the tank, gasoline tank, then he got

off the truck and went to this fifty-gallon drum and there was a little pump attached to it and he took this open gallon measure and filled it up and went over to the engine; he took the priming cap off the engine and poured the gasoline into the engine, then he started to turn the wheel slow, he started it faster and faster, then he told me to touch the switch, I didn't do anything then, I just stood there, and he pulled the switch, . . . and there was several sparks and then a couple of puffs and there was a big explosion. I ran out, he ran out and fell in the main street . . . ." This witness further testified on cross-examination that as far as he saw there was no gasoline exposed in the room where this pump was except what Neiss poured into the top of the primer. There was an apparent conflict between the testimony given by this witness at a former trial and that given by him at this trial as to which switch it was that the sparks came from, that is, whether it was the starting switch or the knife blade switch. His present testimony was that they came from the starting switch.

Mary Neiss, a sister of the deceased, testified that he told her he was getting ready to fill a tank and there was an explosion and his overalls caught fire. From the testimony of one Hubbard, an employee of the defendant, it could have been found that he went to the plant the day before the fire and saw the defendant there; that the tank truck was being filled, the gasoline pump was not pumping as it should, and the witness mentioned it to the defendant who said that he thought the trouble was not in the motor but in the switch, that he had called an electrician, who had worked on it and was "going for a part." The defendant testified that his son told him on Friday before the accident that the pump was not pumping fast enough; that he sent for an electrician who came on that day, was shown the mechanism and was told that it was not pumping right; that the electrician said he had to get something he did not have and would return with it the following day.

One Allen, who qualified as an expert for the installation of pumps for inflammable fluids, testified that in his opinion

if, after a gasoline pump had been primed with a gallon of gasoline and the plug was off, and the handle of the pump turned rapidly, the switch was thrown and sparks appeared and an explosion followed, it was the result of vapor from the gasoline mixed with air coming in contact with the arcing of the switch. This witness further testified that "sparking" or "arcing" is caused by breaking contact. He then left the stand to examine the starting switch in evidence more closely. He then testified that before the handle left the copper segment marked "start" it made contact with the segment marked "run"; that if the knife blade switch was open and the handle of the starting switch was in the down or off position it was not physically possible to cause a spark by closing the knife blade switch.

One Phelps, an electrician, testified that on the Friday before the fire the defendant called him to look at the motor; that he examined the apparatus and found the winding of the magnetic coil that operated the release mechanism of the handle of the starting switch was so charred that it was not operating, that the copper contacts on the face of the switch (with which the handle connected as it was raised to "start" and "run") were so badly worn that the contacts were poor, which would account for the motor running slow, and that he took the coil off and to his home, telling the defendant that he had it but that the absence of the coil would not affect the running of the motor except that the automatic release of the handle would not work. He further testified that he rewound the coil, carried it back to the defendant's plant on Saturday afternoon, replaced the coil and took off the copper segments from the front of the switch at the "start" and "run" positions, and filed down the copper facings so that there would be a smooth contact with the starting switch handle; that when he left on Saturday night the electrical apparatus was in first class condition; that he ran the motor, using the starting switch to operate it, and that it ran properly; that it was electrically impossible to get a spark by raising the handle from the "start" to the "run" position with the apparatus in the condition that he left it on Saturday

morning and that the handle was always in contact with one or the other copper segment by being raised.

Another expert, one Pote, testified that he examined the starting switch in evidence; that the shoe on the starting switch handle was never out of contact with the segments marked "start" and "run" while being raised in the "run" position, and, therefore, there was no break in the circuit which would cause a spark while the handle was being raised and nothing inside of the switch that could make a spark.

There was evidence relating to the dependency of the parents of the deceased upon his wages for support that he gave his mother. She was asked, "Were you dependent upon him for that money?" The answer was, "Yes, I was." The defendant excepted to this testimony. She further testified that she needed his money in other ways — for clothing and doctors' bills; that he gave her all his money except when he needed it for clothes, when she gave it back to him; that her husband was working but that she did not get enough from what he gave her to support the family; that she did not know exactly how much the deceased gave her.

Exceptions saved by the defendant to the refusal to direct verdicts on both counts of the declaration first raise the question whether the evidence heretofore recited would warrant the jury in finding negligence on the part of the defendant proximately causing the injury and death. As the defendant was not an "insured person," the defences of contributory negligence, assumption of risk, and the fellow servant rule are not open. The defendant may rely upon the so called contractual assumption of the risk, which relates to the issue of the defendant's negligence. *Sylvain* v. *Boston & Maine Railroad*, 280 Mass. 503, 505. *Cronan* v. *Armitage*, 285 Mass. 520. There was evidence from which the jury could have found that negligence of the defendant was the proximate cause of the injury and death. It could have been found that sparks came from the starting switch; that this switch was defective and the defendant knew it; that the defect

was not remedied; and that the explosion resulted when the vapor from the gasoline and the air formed a mixture which ignited by sparking of the starting switch. See *Lynch* v. *M. T. Stevens & Sons Co.* 187 Mass. 397, 398; *Souden* v. *Fore River Ship Building Co.* 223 Mass. 509, 512; *Lamberti* v. *Neal*, 253 Mass. 99, 105, 106; *Carpenter* v. *Sinclair Refining Co.* 237 Mass. 230, 233.

The defendant contends, however, that the jury were not entitled to believe the testimony of Muse, the only eye witness to the accident, to the effect that sparks came from the starting switch; that this was a physical impossibility based upon the expert testimony that sparking is caused by breaking contact, and that the handle and plates on a starting switch of this type are always in contact. Testimony given in direct contravention of physical laws is necessarily deemed incredible, but that is not this case. The starting switch in evidence was not the starting switch involved in this accident. The testimony of the witness Phelps, the electrician who made the repairs, was that the copper contacts on the face of the starting switch involved in the accident were so badly worn that the contacts were poor, and though he testified that he repaired the condition so that a spark was impossible, the jury were not required to believe him. In addition, a finding that sparks came from the starting box is contrary to no physical law, or any established mechanical fact presented to the jury, but it is simply a disbelief of the opinion of certain mechanical experts that no sparks would be caused by a switch of this type. An expert opinion, that a cause of sparking or arcing is a gap and that since there is no gap between the plates of this type of switch there could have been no arcing, is not the conclusive establishment of a physical fact which would be binding on the jury and conclusive in the present case. The physical fact that arcing was impossible on the switch involved in the accident was not established. The facts in evidence were simply that, as a matter of expert opinion, arcing on a switch of this type was impossible. The jury were not required to believe this testimony and they were entitled to take the statement of Muse that he saw the

starting switch spark. The mere fact that his testimony
in the last trial was apparently contrary to that given at
a former trial does not render his present testimony un-
worthy of belief, especially where it could have been found
on the evidence that he made a mistake at the first trial
as to which switch he meant. The credibility of the wit-
ness was for the jury. *Kane* v. *Learned*, 117 Mass. 190,
194. *Connors* v. *Richards*, 230 Mass. 436, 438. *Warner* v.
*Fuller*, 245 Mass. 520, 529.

The defendant further contends that no liability exists
here because, even assuming that it could have been found on
the evidence that a spark came from the starting switch,
the proximate cause of the explosion was the act of the
deceased in starting the pump with the plug out and thereby
spurting gasoline up into the room. The defendant argues
that it was his duty to have apparatus that was reasonably
safe for the conditions reasonably and probably to be ex-
pected, and that the apparatus was perfectly safe except
for the not to be foreseen act of the deceased. This con-
tention is based on the assumption that the explosion was
and could have been caused only by the gasoline being
sprayed from the open primer. But there is no reason to
believe that the explosion could have been caused only in
this way. The jury would have been warranted in finding
that the vapor which came from the mere act of pouring
the gasoline down the pipe created the explosive mixture.
The necessity of priming the pump at certain times was
established by the evidence. The possible presence of
explosive vapor in the pump room was therefore fore-
seeable.

It could not properly have been ruled that the deceased
contractually assumed the risk. The danger from this
switch in the circumstances which could have been found
to exist cannot be said to have been obvious to the de-
ceased at the time of the beginning of his employment.
*Cronan* v. *Armitage*, 285 Mass. 520. See *Carpenter* v. *Sin-
clair Refining Co.* 237 Mass. 230, 235. No error is shown
in the refusal to charge the jury on the contractual assump-
tion of the risk as requested by the defendant. Full and

adequate instructions upon this subject were given to the jury. *Cronan* v. *Armitage*, 285 Mass. 520, 527, 528.

The defendant excepted to the admission of certain questions asked by the plaintiff's counsel of the witnesses Allen, Phelps and Hubbard. The evidence need not be referred to in detail; it is sufficient to say that in the admission of the testimony we find no reversible error.

There was ample evidence for the jury on the question of the dependency of the mother of the deceased. This was a fact necessary to be proved to maintain an action for death under G. L. (Ter. Ed.) c. 229, §§ 4, 7. *Daly* v. *New Jersey Steel & Iron Co.* 155 Mass. 1, 5. *Morena* v. *Winston*, 194 Mass. 378, 383. Partial dependence is sufficient proof under the statute. *Mulhall* v. *Fallon*, 176 Mass. 266, 267. *Mehan* v. *Lowell Electric Light Corp.* 192 Mass. 53, 61. *Bartley* v. *Boston & Northern Street Railway*, 198 Mass. 163, 172. The exceptions to the questions asked the mother of the deceased cannot be sustained. Exceptions taken at the trial which have not been argued are deemed to be waived.

It is plain that upon all the evidence the refusal of the trial judge to direct a verdict for the defendant for failure to show negligence, employment, or dependence was proper. It does not appear that there was any error in the admission of evidence which required the reversal of the finding by the jury of liability on the part of the defendant on either count of the declaration.

The only other questions which remain relate to the issue of damages. Count 1 is brought under G. L. (Ter. Ed.) c. 229, § 7, to enforce the liability of the defendant under that act for both personal injuries to, and the death of, the employee. Count 2 is brought under the same section to enforce the liability of the defendant for the conscious suffering of the employee, based on the common law. The judge instructed the jury that damages under both parts of count 1 were to be assessed with reference to the degree of culpability. Upon that count they returned a verdict of $3,200 for the next of kin, and $3,200 for the personal representative, namely, the administrator. The jury were

instructed that the damages under count 2 were compen-
satory, and a verdict was returned on that count for $5,000.
By St. 1892, c. 260, § 1, provision was made for a right of
action for death, where the death "is not instantaneous,
or is preceded by conscious suffering . . . ." This right
of action for death was given to the administrator, to be
enforced in the action brought by him for the personal
injuries caused to the employee. The total damages for
both death and personal injury were limited to $5,000
(later $10,000). If there were no persons entitled to bring
suit under St. 1887, c. 270, § 2, for instantaneous death,
then no damages for death could be awarded. The jury
were to apportion the damages between the legal repre-
sentatives and the persons, if any, entitled to bring an
action for instantaneous death. See now G. L. (Ter. Ed.)
c. 229, §§ 7, 9. St. 1892, c. 260, gave the first remedy for
the death of an employee preceded by conscious suffering.
*Smith* v. *Thomson-Houston Electric Co.* 188 Mass. 371, 376.
St. 1892, c. 260, provided a new liability for death, but
provided, in substance, that anyone who should avail him-
self of it should thereby limit his damages for death and
for conscious suffering together to $5,000 (later $10,000),
and should not have any right to recover up to $4,000
besides for conscious suffering under the employers' lia-
bility act. *Smith* v. *Thomson-Houston Electric Co.* 188
Mass. 371, 377. Furthermore, under the statute of 1892
the administrator could not maintain an action for death
alone, where it was preceded by conscious suffering, with-
out claiming in the same action damages for conscious
suffering. *Gerry* v. *Worcester Consolidated Street Railway*,
248 Mass. 559, 563. "It is the object of this section in
requiring a joinder to avoid multiplicity of suits, and to
keep the entire damages recoverable within the imposed
restriction." *Smith* v. *Thomson-Houston Electric Co.* 188
Mass. 371, 377. But, apparently, a plaintiff was at liberty
to sue for conscious suffering in a separate action under
the employers' liability act, or at common law, and abandon
the claim for death. *Smith* v. *Thomson-Houston Electric
Co.* 188 Mass. 371, at page 377. By St. 1906, c. 370, the

provisions of St. 1892, c. 260, § 1 (then contained in R. L. c. 106, § 72,) were amended by adding the clause now contained in G. L. (Ter. Ed.) c. 229, § 7, "and in the same action under a separate count at common law, may recover damages for conscious suffering from the same injury." St. 1906, c. 370, required a separate count for conscious suffering at common law. This statute, however, was intended to provide not for double recovery of damages for personal injuries, i.e., conscious suffering, but only for recovery in the same action for death and for personal injury, that is, conscious suffering, where the latter was based on the common law as well as where it was based on the employers'. liability act. It simply provided for a case theretofore omitted, the common law liability for the same personal injury. *Howard* v. *Fall River Iron Works Co.* 203 Mass. 273. After this act, if the administrator claimed to recover for death, he must also claim for personal injuries in the same action, whether the cause of action for injuries was based on the employers' liability act or the common law, and must limit his entire damages to the statutory sum, now $10,000. By St. 1927, c. 213, the limit as to damages except for death was removed. Up to the time of the enactment of the General Laws there was nothing to indicate that the damages for personal injuries were to be assessed according to the degree of culpability. The typical verdict in an action for the death and conscious suffering of an employee is shown in *Polvere* v. *Hugh Nawn Contracting Co.* 215 Mass. 199, 201, and *Boott Mills* v. *Boston & Maine Railroad*, 218 Mass. 582, 593. By St. 1909, c. 514, § 131, it was provided that "If under the provisions of sections one hundred and twenty-eight [G. L. (Ter. Ed.) c. 229, § 7] and one hundred and twenty-nine [G. L. (Ter. Ed.) c. 229, § 4] damages are awarded for the death, they shall be assessed with reference to the degree of culpability . . . ." Without any apparent intent to change the law, this was recast in G. L. c. 229, § 9, into the following: "If under section four or section seven damages are awarded for death or for injury and death, they shall be assessed with reference to the degree of culpabil-

ity . . . ." It is plain that the Legislature did not intend to change the entire theory of damages for personal injuries, i.e., conscious suffering; and this not by a formal amendment but in a mere restatement or revision of the statutes. The statute provides that the damages for both death and personal injuries are to be "apportioned by the jury." There is no indication that a double penalty is to be imposed.

The proper construction of G. L. (Ter. Ed.) c. 229, § 9, is that the damages awarded for death in an action "for death or for injury and death" are to be punitive, and then the entire award is to be apportioned, the punitive damages for death going to the next of kin in the present case, and the compensatory damages for personal injuries, whether under the employers' liability act, or at common law, going to the administrator. The damages for personal injuries are not punitive. G. L. (Ter. Ed.) c. 229, § 9, reads: "If under section four or section seven damages are awarded for death or for injury and death, they shall be assessed with reference to the degree of culpability . . . ." It seems that in drafting this section of the statute it was believed that the recovery under the sections cited was not properly described as for "death." It is apparent that in an attempt to make a slight correction the way was opened for a misconception respecting the meaning of the statute. Only a single award of damages can be made for personal injuries, that is, for conscious suffering, whether the basis of liability is the employers' liability act, or the common law. The trial judge erred in allowing punitive damages for both injury and death under count 1. He correctly admitted evidence of conscious suffering under the second count, and rightly ruled that damages for conscious suffering under that count were compensatory; but he was wrong in allowing such damages to be added to the damages allowed under the first count. It is plain that prior to the enactment of the General Laws there was no ground for assessing damages under § 9 for both death and conscious suffering, with reference to the degree of culpability. In the preliminary or final reports of the

commissioners who prepared the General Laws there is nothing to indicate that any change in the law was intended by G. L. c. 229, § 9. It is the general rule that verbal changes in the revision of a statute do not alter its meaning, and are construed as a continuation of the previous law. *Savage* v. *Shaw*, 195 Mass. 571, 572, 573. *Main* v. *County of Plymouth*, 223 Mass. 66, 69, and cases collected. *Commonwealth* v. *Welosky*, 276 Mass. 398, 409, and cases cited. *Duggan* v. *Ogden*, 278 Mass. 432, 434. *Northridge* v. *Grenier*, 278 Mass. 438, 440. The changes in a revision of a law, however, may be so violent as to take them out of the general rule. *Hanley* v. *Eastern Steamship Corp.* 221 Mass. 125, 132. *Boston & Maine Railroad* v. *Billerica*, 262 Mass. 439, 449. *Dowling* v. *Board of Assessors of Boston*, 268 Mass. 480, 483, 484. The present case falls within the general rule. Any other construction would lead to an absurd result and would be altogether out of harmony with the general principles of damages, and with the general trend of statutes.

We are of opinion that there should be a new trial on the question of damages. At the new trial the damages are to be limited under count 1 to death. As a matter of pleading damages cannot properly be demanded for both death and conscious suffering in a single count. The personal injury for which damages are sought in each count is alleged in the same language and is plainly under the employers' liability act. G. L. (Ter. Ed.) c. 153, § 1, First. Damages for conscious suffering constitute one indivisible factor whether the right to such damages is given by the common law or by the employers' liability act or by both. Since the enactment of St. 1927, c. 213, whereby the limit of damages recoverable for conscious suffering was removed, the last paragraph of G. L. (Ter. Ed.) c. 229, § 9, as to apportionment of damages cannot be operative. No apportionment now is possible. Damages for death alone are now limited. Damages for conscious suffering now are unlimited. The law provides specifically how each kind of damage shall be awarded.

It does not appear that the cause of action for liability

is so interwoven with that of damages that a new trial should be had on the question of liability. The result is that the verdicts are to stand so far as they relate to liability, but an entire new trial should be had on damages.

*So ordered.*