FAE EVA CAHOW AND RAYMOND CAHOW, RESPONDENTS, *v.* THEODORE MICHELAS, APPELLANT.

No. 3396

May 31, 1944.                    149 P. (2d.) 233.

*Lewis & Hawkins,* of Las Vegas, for Appellant.

*Morse & Graves,* of Las Vegas, for Respondents.

# OPINION

By the Court, TABER, J.:

The Eighth judicial district court, Clark County, awarded plaintiffs $600 damages for personal injuries alleged to have been sustained by Mrs. Cahow in the course of her employment as a waitress in defendant's restaurant (the Nevada Cafe) at Las Vegas, and $429 for consequent loss of wages. Defendant has appealed from the judgment, and from an order denying his motion for a new trial.

One of Mrs. Cahow's duties was to carry dirty dishes from the front part of the cafe back to the kitchen, and place them on the drainboard of the sink. There was a swinging door near the middle of the partition between the front part of the cafe and the kitchen; and

the sink and drainboard were in the kitchen corner immediately to the right of this door as one passed through it going from the main room back into the kitchen. The floor in the front room was covered with linoleum; the kitchen floor was of concrete, and was usually kept dry and clean. There were some booths and a counter in the front part of the cafe, and most of the cooking was done near the window in that room. The kitchen, or back room, was used for such purposes as washing dishes, cutting meat, preparing vegetables, making ketchup, and cooking soup stock.

According to Mrs. Cahow's testimony the accident which caused her injury happened about 11:20 p. m. on January 31, 1942. She was carrying some dishes from the counter in the front room of the cafe back to the drainboard and sink in the kitchen. Having passed through the connecting doorway, and just before reaching the drainboard and sink, she slipped and fell on the cement floor, dropping the dishes, some of which were broken. As she rose from the floor she noticed that the place where she had slipped was wet and "slick." When she was in the kitchen about half an hour before the accident, she had seen some ketchup which had been spilled at this place on the floor. There was quite a large puddle of ketchup—also pieces of broken ketchup bottle. The floor was dry except where the ketchup was. Between the time when she saw the ketchup and broken glass on the kitchen floor just in front of the drainboard and sink, and the time of the accident, she had served four or five customers in the front part of the cafe. At the time she fell the ketchup had been cleaned up, but the place where it had been was wet with water and very slippery. With the exception of the place where the ketchup had been mopped up, the kitchen floor was dry. After getting up off the floor where she had fallen, Mrs. Cahow went into the front part of the cafe and remarked, "Why didn't they put salt on the floor?" After serving a cup of coffee or two she returned to the kitchen and thinks

that she said to the cook, "Why didn't you put some salt on the floor?" Then she picked up the salt container and tried to put salt on the floor. The cook grabbed it out of her hand, put a sack and apron on it and said, "If you act like that you will have to take a walk." Then she walked into the front room of the cafe.

Claud Wood, an employee of Sears Roebuck & Co. in Las Vegas, testified in behalf of plaintiffs that he was in the cafe when the accident happened. He heard a noise, looked and saw Mrs. Cahow pick herself up off the floor. He heard dishes drop, and looked over the counter and she was getting up off the floor. He did not see her fall, but heard a noise, looked around and saw her bracing herself on her hands to get up. After she got up and walked into the front room of the cafe he heard her say, "Why didn't they put salt on the floor?"

Gus Kamilos, employed as cook at the time of the alleged accident, testified in behalf of defendant that he had a can of water on the grill in the front room of the cafe to keep the water warm in case he wanted to "boil anything up." In taking this can of water back to the kitchen he kicked the swinging door with his foot "and the bottle goes back and I spilled water on the floor." He then put something under the door to make it stay open, got a mop and was cleaning the water up when Mrs. Cahow came through the door into the kitchen. "I said to her, 'Wait a minute.' She stood where she was and that minute I heard the dishes and glasses fall right in front of me and I went on with the dust pan and picked all of those up to dry it up and she says to me, she says, 'Put some salt on it.' She went up to work on the counter again, and I finished the mopping. Then I go back to my work." The door was standing open when Mrs. Cahow came back to the kitchen, and there was a plain vew from the front to the back. He was mopping up when she came into the kitchen. She dropped the dishes and glasses, but did not fall. She picked up the dishes and glasses,

except those that were broken; then she returned to the front room of the cafe. There wasn't any ketchup spilled on the floor before he spilled the water and mopped it up. Claud Wood had not been in the cafe any time during January while Kamilos was on shift. The floor was not slippery where he cleaned it up. It was clean water. Mrs. Cahow walked with the ankle of her right foot turned over to one side. He thinks she dropped the dishes and glasses because she twisted her ankle. She did not fall, and was not sitting on the floor at any time. She did not slip at all. She did say, "Why didn't you put salt on the floor?" and she went out to get the salt herself, but he told her to "pick up all those glasses and water from the floor." She had dropped glasses and dishes, and there naturally was more water and glasses there. She did not put salt on the floor. He did not grab any salt container out of her hand, and did not say any such thing to her as, "If you act like that you will have to take a walk."

Testimony given by and in behalf of plaintiffs was to the effect that the most serious injury resulting from the alleged accident was that in the lumbar region of Mrs. Cahow's back. Testimony given in behalf of defendant was to the effect that Mrs. Cahow, on a number of occasions, had spoken of an automobile accident in which her back was injured; that she habitually turned her right ankle while walking, and that before the alleged accident she had been observed wearing a brace or a cloth, or something of the kind, around her right ankle and on her right foot. Mrs. Cahow denied saying that she had been in an automobile accident, and denied that she had worn a brace on her right ankle at any time while working at the Nevada Cafe. Testimony regarding the nature and extent of Mrs. Cahow's injuries was given by plaintiffs and by Drs. Swank and Wallace; in connection with the medical testimony, X-rays showing back injuries were admitted in evidence, and are on file as part of the record on this appeal.

Plaintiffs' complaint alleged, among other things, negligence on the part of defendant, that said negligence was the direct and proximate cause of Mrs. Cahow's injuries, and that defendant had not accepted the terms of and agreed to be governed by the provisions of the Nevada industrial insurance act of 1913, as amended. The latter allegation was not denied, but defendant's answer specifically denied that Mrs. Cahow received any injuries while in his employ, and further specifically denied that he was at any time careless, negligent or reckless in his conduct or with respect to the condition of his place of business, as set forth in plaintiffs' complaint, or at all.

The trial court found, in part, that defendant "did carelessly, negligently, recklessly and knowingly permit and allow the floor by the sink in the kitchen in said cafe to be wetted and slippery; that it is a fact that at the said time and place and under said conditions hereinbefore set forth, the said defendant, Theodore Michelas, did carelessly, negligently, recklessly, and knowingly fail to take any precaution or to do any act to remedy the condition of said floor in said kitchen; that it is a fact that the said defendant, Theodore Michelas, did carelessly, negligently, recklessly and knowingly permit the condition on said floor to remain as hereinbefore described for the use of the said plaintiff, Fae Eva Cahow, in her performance of her said duties as hereinbefore set forth; that it is a fact that at said time and place and as herein described and in the performance of her said duties as herein described, the said plaintiff, Fae Eva Cahow, in removing dishes from said table in said cafe to said sink, slipped on said wetted and slippery floor and fell on said floor with such force and violence as to injure her back and to tear ligaments in her back and affect the use of her right arm and to suffer severe and excruciating pains in her back and arm; that it is a fact that the said Fae Eva Cahow was unable to work by reason of said injuries from January 31st, 1942 to June 8th, 1942;

\* \* \* that since the 31st day of January, 1942, the said plaintiff, Fae Eva Cahow has had to have hospitalization, medical treatment and care for said injuries; that it is a fact that immediately prior to and before receiving said injuries the said plaintiff, Fae Eva Cahow was sound of mind and body, that it is a fact that the direct and approximate cause of said injuries to the said Fae Eva Cahow, as hereinbefore described, were the carelessness, negligence, recklessness and knowing acts of the defendant."

The Nevada industrial insurance act (Stats. of Nevada, 1913, Chap. 111), as amended to and including the year 1929, may be found in 2 N. C. L. 1929, beginning with sec. 2680. Subsequent amendments, to and including the year 1941, are given in Vol. 1 of the 1931-1941 Supplement to N. C. L. 1929, beginning at page 310. The legislature of 1943 made some further amendments (Stats. of Nevada 1943, Chap. 136, pp. 186-195). The provisions with which we are chiefly concerned in this case are those of section 1(b) of the act, as amended. Stats. of Nevada 1941, Chap. 159, p. 368, 1 N. C. L. Supp. 1931-1941, sec. 2680, p. 311. Said section 1(b) as it appears in sec. 2680, N. C. L. 1929, is quoted in full in Reeder v. Pincolini, 59 Nev. 396, 94 P. 2d 1097. As the only change made by the 1941 amendment was to substitute the words "guilty of contributory negligence" for the word "negligent" in subdivision (3), it is deemed unnecessary to again quote section 1(b) in full.

Defendant had the right, under the provisions of the industrial insurance act, to accept its terms, conditions and provisions, but failed to do so. At the time of the alleged accidental injury Mrs. Cahow was an employee of defendant, and her injury, if any, arose out of and in the usual course of employment. If there was any negligence on the part of Mrs. Cahow, the evidence does not show that it was willful and with intent to cause the injury, or the result of intoxication on her part. Defendant could not properly be held liable in

the absence of any negligence attributable to him. Day v. Cloke, 47 Nev. 75, 215 P. 386. But the burden of proof was on him to rebut the statutory presumptions. In determining whether they had been overcome, it was proper for the trial court to take into consideration all the evidence, that of defendant as well as that of plaintiff. Reeder v. Pincolini, supra; O'Brien v. Las Vegas & T. R. Co., 9 Cir. 242 F. 850; 1 Schneider's Workmen's Compensation Text, sec. 129, pp. 341, 342.

When the taking of testimony was concluded, the following proceedings were had in the trial court:

"By the Court: Do you want to argue this case?

"By Mr. Hawkins: Just as your Honor desires. I think it is a case that merits argument both as to the facts and as to the law. I am not prepared at this time to cite the laws that we contend are applicable.

"By the Court: I am interested in your version of the application of the law here. I would be frank to state that the Court's opinion now is that there is only one question involved here, and for the sake of the argument and without conceding the facts to be such, that if the plaintiff slipped and fell in the Nevada Cafe at the time and place alleged in the complaint, there is only one defense available, that is the defenses enumerated in the statute which have not been properly pleaded, and the Court is of the opinion that those defenses must be specially pleaded, otherwise the defendant is practically forced off from all claim, except of course, as to the weight of the proposition as to whether or not the accident did occur. That is always an open defense.

"By the Court: We will be in recess until 3:00 P. M.

"At 3:00 P. M., February 4, 1943, the Court was called to order, both parties present with their counsel. Argument of Counsel.

"By the Court: The matter may stand submitted."

The foregoing remarks of the court do not correctly state the law because, as we have seen, defendant could not properly be held liable for damages in the absence of any negligence attributable to him. Day v. Cloke,

supra. Appellant contends that by reason of this misconstruction of the law the trial court never considered, sifted and weighed the evidence to determine any points other than whether the accident occurred, and the amount of damages to allow. Appellant says he was entitled to have the question of negligence decided by a court properly advised as to the law governing in cases of this nature, rather than to have the question of negligence eliminated from the case.

No evidence favoring or tending to favor defendant was excluded by reason of the court's erroneous view of the law, and the remarks complained of were made before the case was argued. Counsel for the defendant presumably included in his argument the contention that there could be no liability without negligence. In the court's written decision, filed five days after the case was argued, counsel for the plaintiffs were directed to prepare findings. Thereafter proposed findings were filed, and defendant filed his objections and exceptions thereto. The findings were settled and filed, and judgment entered, a little more than a month after the filing of the decision. In said findings the court expressly states that defendant was guilty of negligence, but appellant contends that this finding is not supported by and is contrary to the evidence in the case. He urges that the evidence, particularly that adduced in his behalf, rebutted the statutory presumption of negligence. These were questions for the trial court. Peters v. California Building-Loan Ass'n, 116 Cal. App. 143, 2 P. 2d 439; Mitchell v. Phillips Mining Co., 181 Iowa 600, 165 N. W. 108. There was a sharp conflict in the testimony as to whether Mrs. Cahow slipped and fell, whether the spot on the kitchen floor where she is alleged to have slipped and fallen was slippery, whether, if slippery, defendant negligently permitted it to remain so, and whether the injury, if any, was the proximate cause of defendant's negligence. On these matters the trial court found in favor of plaintiffs. There was substantial evidence, including

the statutory presumptions to support its findings, and as it is not clear to this court that a wrong conclusion was reached, we must follow the general rule that when the evidence is conflicting and there is substantial evidence to support the trial court's findings, they will not be disturbed on appeal. Consolazio v. Summerfield, 54 Nev. 176, 10 P. 2d 629; Valverde v. Valverde, 55 Nev. 82, 26 P. 2d 233.

■ Appellant contends that section 1(b) (1) of the industrial insurance act does not operate to abolish the doctrine of contractual assumption of risk. Ordinarily, says appellant, where one enters the service of another as an employee, he agrees to assume all the open and obvious risks of the employment. Whether the doctrine of contractual assumption of risk obtains in this state notwithstanding the statutory provision above mentioned need not be determined in this case, because it is clear that under the contract of employment Mrs. Cahow could not be held to have assumed the risk that her employer would negligently permit the kitchen floor to become and remain slippery. Neiss v. Burwen, 287 Mass. 82, 191 N. E. 654; Roberts v. Frank's Inc., 314 Mass. 42, 49 N. E. 2d 427; Benson Lumber Co. v. McCann, 9 Cir., 223 F. 1; Rivers v. Krasowski, 303 Mass. 409, 22 N. E. 2d 114; 35 Am. Jur., "Master and Servant," sec. 301, nn. 10–13.

Mrs. Cahow testified that on February 2, 1942, being the second day after the injury, she consulted Dr. McCoy, the union doctor; that about the middle of the same month she consulted Dr. Swank, who sent her to the county hospital where her back was X-rayed. On cross-examination she testified that Dr. McCoy waited upon her about two weeks; that she then changed to Dr. Swank because she was suffering so much that she wanted an X-ray taken; that Dr. Swank treated her two or three weeks, binding her back with adhesive tape and telling her not to do any work, to rest and take hot baths, and that eventually the injury would heal but it would take a long time; that he said the X-ray did not

show any vertebrae misplaced, and that there ' was nothing the matter with her back; that later she changed to Dr. Wallace, a chiropractor, who took another X-ray about March 9; that he said there were several vertebrae out of joint and that this condition could be seen not only in the X-ray he took, but also in the one taken earlier at the hospital; that in the latter the misplaced vertebrae could be seen when held over the light, but not so plainly as in the picture taken by him.

■■ When Dr. Wallace was asked on direct examination to state the result of his examination of Mrs. Cahow made on March 9, counsel for defendant objected, the objection being in part as follows: "We object to this doctor testifying as to the result of any examination which he made on the 9th of March, 1942, for the reason that it is—under the record in this case as it now is— incompetent, irrelevant, immaterial, too remote and is an attempt on the part of this plaintiff to impeach her own witness." In explaining his objection counsel stated that if the purpose of putting Dr. Wallace on the stand was to show "that he took an X-ray which showed different conditions, it would be an effort to show and to contradict her statement as to what the condition of her body was shortly after this purported accident, and it is too remote; it is immaterial." In view of the testimony previously given by Mrs. Cahow regarding the reports made to her by Dr. Swank and Dr. Wallace the court is of the opinion that counsel's objection was properly overruled. The testimony was clearly competent, relevant, and material. It was not too remote, because Dr. Wallace's examination was made only a little more than five weeks after the injury was sustained, and Mrs. Cahow had testified that her suffering and the disabling effects of her injuries extended over a much greater period of time. Nor was the objection well taken that the testimony proposed to be given by Dr. Wallace would constitute an attempt on the part of plaintiffs to impeach their own witness. 32 C. J. S., Evidence, sec. 1040,

p. 1106, notes 39–41; 70 C. J., "Witnesses," sec. 1341, nn. 78, 80.

The last assignment of error relied upon by appellant is that the damages awarded for loss of time are excessive. This assignment is predicated first upon the contention that none of Dr. Wallace's testimony should have been admitted in evidence, and second upon the testimony of Dr. Swank who, according to appellant, testified that Mrs. Cahow should have recovered from the effects of the accident within a period of from two to four weeks after it occurred.

After the making of the X-ray pictures and Dr. Wallace's diagnosis based upon his examination of Mrs. Cahow and his study of the pictures, she received no treatment until June 15, when she began taking treatments from Dr. Wallace. Appellant claims that the period of Mrs. Cahow's disability was prolonged because of her failure to seek medical care from the time Dr. Swank last treated her until she began to take treatments from Dr. Wallace, and that if plaintiffs were entitled to recover any damages for loss of wages, such recovery should be limited, at the outside, to the period from January 31, the date of the accident, to February 28. There is substantial evidence that Mrs. Cahow's disability continued from January 31, 1942, until at least the time this action was commenced. Plaintiffs are entitled to recover for loss of wages during that period, unless recovery should be limited to the month of February 1942 by reason of Mrs. Cahow's not having taken treatments from the end of that month until the middle of June.

Dr. Swank testified in part as follows:

"Q. What was your prognosis in this case at the time of your last treatment? A. I thought the prognosis was very good for a complete recovery after a matter of a few weeks of rest and a mobilization of her back and—because my X-ray that I took did not show any bone injury. However, I know that she could have a lot of quite serious back aches without having

anything that would show in the X-ray because nothing but bones show in the X-ray. * * *

"Q. Assuming Mrs. Cahow was a lady passed 39 just reaching her 40th birthday, suffering and sustaining the objective symptoms you observed when you first treated her on February 16, 1942, and as a result of your further two examinations that you took and your two further treatments, how long in your judgment would Mrs. Cahow be. incapacitated from performing active duties as a waitress, if at all? A. It is very difficult to tell when an acute back injury—how long they are going to be disabled. The ordinary acute back injury pretty well recovers in two to four weeks. However, very frequently, there are back injuries that show nothing in X-ray and seem at first quite trivial, yet the only symptom that can be elicited is the patient's claim of a painful back. I mean there is nothing—there is frequently nothing objectively that you can use to prove how much pain a patient has with back injury in the absence of fracture. * * *

"Q. Have you seen the X-ray that Dr. Wallace testified he took of the backbone? A. No, I haven't.

"Q. Now, did you find anything to indicate injury to the backbone, Doctor? A. There was none shown in my X-ray, no.

"Q. Was there anything that you observed in examining her that would indicate such was true? A. No.

"Q. You would call that a muscular strain or ligament strain? A. I would say she had injuries to both muscles and ligaments, commonly called soft tissues as compared to bone which is hard tissue.

"Q. Was there anything which would enable you to determine whether this was permanent or not? A. At the time I examined her I assumed it was only an acute back injury. With those few examinations—it wouldn't be humanly possible to know whether or not there would be any permanent injury or permanent disability because I saw her only once in February and twice in early March."

It will be observed that the part of Dr. Swank's testimony relied on by appellant states his opinion with reference to ordinary acute back injuries only; no opinion is given regarding the length of time such a person as Mrs. Cahow would be incapacitated as the result of injuries described by Dr. Wallace as "contraction of the muscles of the lumbar region. Rotation of the bodies of all lumbar vertebrae, spinous processes to the left, slipped fourth and fifth · rib on the left side inferiorly."

A few excerpts from Mrs. Cahow's testimony follow:

"Q. How long were you treated by Dr. Swank? A. I couldn't exactly state. I was up to him twice, two weeks at a time when I had the adhesive tape on. He said not to do anything, it would just gradually have to take time to heal. * * *

"Q. How many treatments did you have that you know of from Dr. Wallace? A. Well, I couldn't state just the number, because sometimes I couldn't afford to take them. I did when I possibly could. I tried sometimes two a week and sometimes one a week. I started in June, clear through until this year. * * *

"Q. When did you do any work after this accident you testified to? A. Sometime in September, along about the middle; I tried about two weeks of waitress work; I wasn't exactly a waitress, I worked about an hour in the front and worked in the kitchen making salads and that's about all. It was very light work.

"Q. How long did you work in September? A. Two weeks. * * *

"Q. How many days or weeks have you worked since that time in September to the present time? A. I didn't do any more work until December, and I just tried short jobs.

"Q. What is your condition at the present time? A. Well, at the present time, my back—if I am on my feet more than two or three hours it is still sore. Every morning I am so stiff I can hardly get out of bed. I·can't

lift any heavy packages and I have to wear a girdle all the time. I have a 'Campus Girdle' on continuously.

"Q. That is what was prescribed for you by Dr. Wallace? A. Yes.

"Q. And you wear that all the time? A. Yes, I do. * * *

"Q. And why did you change doctors? (From Dr. McCoy to Dr. Swank) A. Because when I would get off of a chair or from sitting on the edge of a bed, I would go to get up and my leg would give out and go paralyzed, and my arm would do the same. I kept telling him something was wrong. It hurt so bad I couldn't sleep; I couldn't lie down because the pain would be so terrific tears would come to my eyes. I would fall on the floor and have to lie there for half an hour, there was a chair by the bed and I would finally get enough strength to pull myself up by the chair.

"Q. Is that the reason you got Dr. Swank? A. That's right, I went down to have an X-ray taken. * * *

"Q. So afterwards you switched doctors again? A. Yes, I did, but waited sufficient time to see if it would get better.

"Q. And then you went to Dr. Wallace? A. Yes."

Mr. Cahow testified in part:

"Q. Following this time in question, you said January 31, 1942, has she been able to do her own housework in and about the home? A. No, sir. * * *

"Q. What is her physical condition in and about the home at the present time, if you know? A. I do know of Eva leaving the work around the house. When I come home after work I am very tired and I have to help her and get everything straightened around. * * *

"Q. Have you personally, Mr. Cahow, given any treatments or ministrations at all to your wife's back in the last year? A. Yes. * * *

"Q. Just state what you have done. Do you understand the question? A. I have rubbed her back with

an oil treatment to relax the muscles in her back so she could rest at night."

We now quote from the testimony of Dr. Wallace:

"Q. Doctor, did you treat the patient, Mrs. Cahow as a result of your diagnosis of the objective symptoms and of the X-ray pictures? A. No, not at the time of the examination.

"Q. When did you first treat her therefor? A. On the 15th of June, 1942.

"Q. What was her condition on said date with reference to the same objective symptoms as of the first date of your treatment? A. Well, the symptoms were not so acute. We still—the objective diagnosis still showed the rotation of the lumbar vertebrae, a tenderness over the area of the fourth and fifth rib.

"Q. And how many times thereafter Doctor, did you treat her? A. I got a date but I didn't put it down; I think the date—about 39 times.

"Q. What was the date of your last professional treatment? A. The 1st day of February, this year. * * *

"Q. And what objective symptoms, if any did you find to exist at the date of your last treatment? A. A very slight tenderness in certain areas, rotation of the lumbar vertebrae was—well, I would say 75 per cent eliminated. * * *

"Q. Will you give us your prognosis at the present time? A. The prognosis depends on the treatment given. I would say if the treatment is continued as directed the lumbar rotation should be eliminated in another 90 days. These back cases however, with strain, the ultimate prognosis would be another story. * * *

"Q. Will you state as a result of your examination on March 9, 1942 and from the objective symptoms then existing whether or not the plaintiff, your patient, Mrs. Cahow was able to do duties as a waitress. A. She wasn't able, definitely not, with this back condition which she had. * * *

"Q. You heretofore testified, Doctor, and that on to-wit, March 9, 1942, due to the objective symptoms and the X-ray examination that your patient, the plaintiff in this action, wasn't in physical condition to perform duties as a waitress. During your physical examination, Doctor, did you form any opinion as to whether or not she was able at that time or at the time of any of the examinations to perform duties as a waitress, yes or no. A. Yes.

"Q. State when, Doctor. A. She has not been in a condition to handle heavy trays.

"Q. For what period of time? A. Since the time I have known her until the present time.

"Q. That continued until the present time? A. Right.

"Q. Do you have an idea Doctor, how long that condition may continue? A. The patient, I think, has not had treatments regularly enough and it will depend on whether she takes them regularly hereafter. * * *

"Q. Now you testified that you have examined— treated this woman quite a number of times, Doctor, what treatments did you give her? A. What we term chiropractic adjustments.

"Q. What is that, Doctor? A. Manual manipulation of the spine, up and down the vertebrae specifically.

"Q. Did you do any massaging? A. Some.

"Q. And this condition was being remedied, was it? A. Yes.

"Q. As a result of your treatment? A. It was.

"Q. And if she keeps up the treatments that you prescribe it will be—in your judgment what will be the result if she continues those treatments? A. The result in my opinion, will be good. She will be able to—will be reasonably normal."

■ It would serve no useful purpose to comment at length on the testimony set forth in this opinion. After giving it careful consideration, along with all other evidence in the case bearing on the question under discussion, the court does not feel it would be justified in saying that the trial court was wrong in concluding

that plaintiffs should be awarded damages for loss of Mrs. Cahow's wages from January 31, 1942, to the date this action was commenced in the district court.

As the record shows no prejudicial error, the judgment and the order appealed from are affirmed.